# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **1:17 cr 109 (APM)** |
| | ) | |
| AZAM DOOST, also known as | ) | |
| Adam Doost, | ) | |
| | ) | |
| Defendant. | ) | |

---

## DEFENDANT DOOST'S COMBINED RULE 29 AND 33 MOTION

---

Glenn Seiden, *pro hac vice*
SEIDEN NETZKY LAW GROUP, LLC
333 South Wabash Avenue, Suite 2700
Chicago, Illinois 60604
312.236.3060
Illinois Bar ID 2543761
gseiden@snlgllc.com

Andrew M. Friedman
Shulman, Rogers, Gandal, Pordy & Ecker, P.A.
12505 Park Potomac Avenue, 6th Floor
Potomac, MD 20854
301.231.0942
Bar ID 462131
afriedman@shulmanrogers.com

# TABLE OF CONTENTS

TABLE OF CONTENTS                                                                    i

TABLE OF AUTHORITIES                                                               iii

EXHIBIT LIST                                                                         x

PROCEDURAL HISTORY                                                                   1

STATEMENT OF FACTS                                                                   2

LEGAL STANDARD                                                                       5

ARGUMENT                                                                             6

I.    As a Matter of Law, this Court Should Enter a Judgment of Acquittal on Count XV.  6

   A.    Doost's Alleged False Statement was in Response to an Exchange So Fundamentally Ambiguous That No Rational Juror Could Have Convicted Him.   6

II.    Doost Received Ineffective Assistance of Counsel at Many Critical Stages of Trial in Violation of His Sixth Amendment Rights.   14

   A.    Trial Counsel Failed to Submit and Consider Two Separate and Independent Audits That Refuted the Government's Argument That Defendant Had Not Purchased Certain Items of Machinery and Instead Had Taken Loan Funds for His Own Personal Use.   15

   B.    Trial Counsel Failed to Challenge the Indictment on Statute of Limitations Grounds.   18

   C.    Trial Counsel Failed to Challenge Several Portions of the Indictment as Multiplicitous.   19

   D.    Trial Counsel Failed to Object to the Admission of Foreign Business Documents from an Untrustworthy Source.   20

   E.    Trial Counsel Failed to Call Several Imperative Witnesses Who Were Present and Available to Testify During Trial.   22

   F.    Trial Counsel Failed to Present Evidence That Would Have Absolved Doost of Culpability Under Count XV – False Statement on a Loan Application and Failed to Object to Faulty Jury Instructions.   28

   G.    Trial Counsel Failed to Object to Faulty Jury Instructions/Verdict Forms.   29

III.    The Indictment was Defective and Should Be Dismissed.   30

   A.    This Court Could Should Hear Defective Indictment Claims Because Though Untimely, there is "Good Cause".   30

   B.    The Indictment Was Multiplicitous and Prejudicial in Charging Doost with Three Counts of Major Fraud Under 18 U.S.C. 1031.   32

   C.    The Indictment Was Multiplicitous and Prejudicial in Charging Doost with Two Counts of Making a False Statement Within the Same Document.   35

D.    Count I – Major Fraud Against the United States is Barred by the Statute of Limitations.    36

E.    Counts IV-XI – Wire Fraud Counts Are Barred by the Statute of Limitations.    37

F.    Counts XII-XIII – False Statement on Loan Application or Extension Counts Are Barred by the Statute of Limitations.    37

G.    Counts XIV and XV – False Statement on Loan Application or Extension Counts Are Barred by the Statute of Limitations.    38

H.    Counts XVI-XXIII – Money Laundering Counts Are Barred by the Statute of Limitations.    38

IV.    The Admission of the Foreign Business Documents Was in Error Because the Documents Were Procured from an Untrustworthy Source.    39

CONCLUSION    42

CERTIFICATE OF SERVICE    43

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andrews v. United States*,
403 F.2d 341 (9th Cir. 1968) ................................................................. 28

*Brooks v. Texas*,
381 F.2d 619 (5th Cir. 1967) ................................................................. 28

*Brubaker v. Dickson*,
310 F.2d 30 (9th Cir. 1962) ............................................................. 28, 30

*Clarridge*,
811 F.Supp. 697 ........................................................... 18, 20, 34, 36

*Coles v. Peyton*,
389 F.2d 224 (4th Cir.) ......................................................................... 28

*Fisher v. United States*,
231 F.2d 99 (9th Cir. 1956) ............................................................ 32, 36

*Fournier v. United States*,
58 F.2d 3 (7th Cir. 1931) ....................................................................... 37

*Garton v. Swenson*,
497 F.2d 1137 (8th Cir. 1974) ............................................................... 28

*Harris v. Reed*,
894 F.2d 871 (7th Cir. 1990) ................................................................. 28

*Hinton v. Alabama*,
571 U.S. 263 (2014) ............................................................................... 17

*Johns v. Perini*,
462 F.2d 1308 (6th Cir.) ........................................................................ 28

*Joseph v. Coyle*,
469 F.3d 441 (6th Cir. 2006) ........................................................... 19, 30

*McQueen v. Swenson*,
498 F.2d 207 (8th Cir. 1974) ................................................................. 28

*Mississippi River Grain Elevator, Inc. v. Bartlett & Co.*, Grain,
659 F.2d 1314 (5th Cir. 1981) ............................................................... 39

*Pennington v. Beto*,
    437 F.2d 1281 (5th Cir. 1971) ............................................................ 28

*Reynoso v. Giurbino*,
    462 F.3d 1099 (9th Cir. 2006) ............................................................ 22

*Saks Int'l, Inc. v. M/V Exp. Champion*,
    817 F.2d 1011 (2d Cir. 1987) ............................................................ 39

*Strickland v. Washington*,
    466 U.S. 668 (1984) ............................................................ 15, 22

*Sylvester v. United States*,
    868 F.3d 503 (6th Cir. 2017) ............................................................ 18

*United States v. Abu Khatallah*,
    316 F. Supp. 3d 207 (D.D.C. 2018) ............................................................ 30

*United States v. Bailey*,
    322 F. Supp. 3d 661 (D. Md. 2017) ............................................................ 8

*United States v. Baker*,
    626 F.2d 512 (5th Cir.1980) ............................................................ 13

*United States v. Bankston*,
    820 F.3d 215 (6th Cir. 2016) ............................................................ 19, 30, 31

*United States v. Barbour*,
    813 F.2d 1232 (D.C. Cir. 1987) ............................................................ 22

*United States v. Brandon*,
    17 F.3d 409 (1st Cir.1994) ............................................................ 33, 34

*United States v. Bruce*,
    89 F.3d 886 (D.C. Cir. 1996) ............................................................ 32, 33

*United States v. Cameron*,
    729 F. Supp. 2d 418 (D. Me. 2010) ............................................................ 30

*United States v. Camper*,
    384 F.3d 1073 (9th Cir.2004) ............................................................ 7

*United States v. Culliton*,
    328 F.3d 1074 (9th Cir.2003) ............................................................ 7

*United States v. Decoster*,
624 F.2d 196 (D.C. Cir. 1976) ....................................................... 28

*United States v. Farmer*,
137 F.3d 1265 (10th Cir. 1998) ............................................... 12, 13

*United States v. Garland*,
337 F. Supp. 1 (N.D. Ill. 1971) ..................................................... 37

*United States v. Glantz*,
847 F.2d 1 (1st Cir.1988) ............................................................ 13

*United States v. Gonzalez*,
81 F. Supp. 3d 1212 (D.N.M. 2015) ............................................. 31

*United States v. Hall*,
565 F.2d 917 (5th Cir. 1978)........................................................ 30

*United States v. Harrington*,
108 F.3d 1460 (D.C. Cir. 1997) ..................................................... 5

*United States v. Heath*,
970 F.2d 1397 (5th Cir. 1992) ...................................................... 33

*United States v. Hurt*,
527 F.3d 1347 (D.C. Cir. 2008) ............................................... 14, 21

*United States v. Jiang*,
476 F.3d 1026 (9th Cir. 2007).............................................. Passim

*United States v. Jones*,
403 F.3d 604 (8th Cir. 2005).......................................... 19, 20, 36

*United States v. Kayode*,
254 F.3d 204 (D.C. Cir. 2001) ....................................................... 5

*United States v. Kellington*,
217 F.3d 1084 (9th Cir. 2000)..................................................... 5, 6

*United States v. Khatallah*,
278 F. Supp. 3d 1 (D.D.C. 2017) .................................................. 40

*United States v. Lattimore*,
127 F.Supp. 405 (D.D.C.) .............................................................. 7

*United States v. Lemire*,
720 F.2d 1327 (D.C. Cir. 1983) ........................................................ 39

*United States v. Lemons*,
941 F.2d 309 (5th Cir.1991) ........................................................... 32

*United States v. Lighte*,
782 F.2d 367 (2d Cir.1986) ............................................................. 6

*United States v. Lilly*,
983 F.2d 300 (1st Cir.1992) ........................................................ 32, 33

*United States v. Lyles*,
2006 WL 1466843 (D.D.C. May 25, 2006) ........................................ 20

*United States v. Mangieri*,
694 F.2d 1270 (D.C.Cir.1982) ...................................................... 6, 35

*United States v. Martellano*,
675 F.2d 940 (7th Cir.1982) ............................................................ 7

*United States v. Mohammed*,
863 F.3d 885 (D.C. Cir. 2017) ......................................... 15, 22, 25, 26

*United States v. Molinaro*,
11 F.3d 853 (9th Cir. 1993) ........................................................... 34

*United States v. Naegele*,
341 B.R. 349 (D.D.C. 2006) ...................................................... 6, 7, 10

*United States v. Naegele*,
537 F. Supp. 2d 36 (D.D.C. 2008) ..................................................... 5

*United States v. Palomba*,
31 F.3d 1456 (9th Cir. 1994) ................................................. 18, 19, 31

*United States v. Phillips*,
962 F. Supp. 200 (D.D.C. 1997) ...................................................... 34

*United States v. Reese*,
561 F.2d 894 (D.C.Cir.1977) ........................................................... 5

*United States v. Reitmeyer*,
356 F.3d 1313 (10th Cir. 2004) ...................................................... 36

*United States v. Robison,*
   505 F.3d 1208 (11th Cir. 2007) ........................................................................ 13

*United States v. Sahley,*
   526 F.2d 913 (5th Cir.1976) ............................................................................. 35

*United States v. Sain,*
   141 F.3d 463 (3d Cir. 1998) ............................................................................. 32

*United States v. Sainz,*
   772 F.2d 559 (9th Cir. 1985) ....................................................................... 12, 13

*United States v. Sarwari,*
   669 F.3d 401 (4th Cir. 2012) ............................................................................. 7

*United States v. Strohm,*
   671 F.3d 1173 (10th Cir. 2011) ........................................................................ 10

*United States v. Strother,*
   49 F.3d 869 (2d Cir. 1995) ............................................................................... 39

*United States v. Sue,*
   586 F.2d 70 (8th Cir.1978) ............................................................................... 35

*United States v. Thompson,*
   275 F. Supp. 3d 107 (D.D.C. 2017) ................................................................... 5

*United States v. Weathers,*
   186 F.3d 948 (D.C.Cir.1999) ........................................................................... 30

*United States v. Wiehl,*
   904 F. Supp. 81 (N.D.N.Y. 1995) .......................................................... 32, 33, 34

*United States v. Wilkins,*
   2017 WL 2458904 (D.D.C. June 6, 2017) .................................................... 18, 19

*Weathers,*
   493 F.3d ..................................................................................................... 18, 32

*Wilcox v. McGee,*
   241 F.3d 1242 (9th Cir. 2001) ......................................................................... 19

*Young v. Dretke,*
   356 F.3d 616 (5th Cir. 2004) ........................................................................... 18

*Young v. United States*,
  56 A.3d 1184 (D.C. 2012) ................................................................... 24

**Statutes**

18 U.S.C. 1031 ........................................................................... 1, 32

18 U.S.C. § 2 ................................................................................ 1

18 U.S.C. § 1001(a) ....................................................................... 10

18 U.S.C. § 1343 ........................................................................ 1, 37

18 U.S.C. § 3505(a)(1) .................................................................... 41

18 U.S.C. §§ 981(a)(1)(C) and 982(a)(1) ................................................... 1

18 U.S.C. §§ 1031(a) ........................................................... 1, 32, 33, 36

18 U.S.C. §§ 1956(a)(1)(B)(i) .............................................................. 1

18 U.S.C. §§ 1956(a)(1)(B)(i) and (2) ................................................. 1, 38

18 U.S.C. § 1031(f) ....................................................................... 36

18 U.S.C. § 3282 .......................................................................... 37

18 U.S.C. § 3505 .......................................................................... 39

22 U.S.C. § 2197(n) .................................................................. Passim

28 U.S.C. § 2461(c) ........................................................................ 1

**Rules**

Fed. R. Crim. P. 12(b) .................................................................... 30

Fed. R. Crim. P. 12(b)(3)(B) .............................................................. 30

Fed. R. Crim. P. 33(a) ..................................................................... 5

Fed.R.Civ.P.5 ............................................................................. 43

Fed R. Evid. 106 ........................................................................... 8

Federal Rule of Criminal Procedure 29 .................................................. 5, 6

Federal Rule of Criminal Procedure 33 ...................................................................................... 5, 6

# EXHIBIT LIST

Exhibit 1          Defendant's Trial Exhibit 4 – Email Chain Between A. Doost and J. Constanz Re: Security Update 04/06/2012

Exhibit 2          Government's Trial Exhibit 812 – OPIC Notice of Default and Reservation of Rights, dated April 12, 2013, sent to Equity Capital Mining

Exhibit 3          Defendant's Trial Exhibit 9 – Email Chain Between A. Doost and J. Constanz Re: Loan Status ARFC and OPIC 10/17/12

Exhibit 4          Defendant's Trial Exhibit 10 – Email Chain Between A. Doost and J. Constanz Re:Issues Affecting Loan Payment 12/5/12

Exhibit 5          Defendant's Trial Exhibit 11 – Email Chain Between A. Doost, C. Shepard, J. Constanz Re: ECM Default Notice and Completion Demand 4/16/13

Exhibit 6          Defendant's Trial Exhibit 12 – Email Between A. Doost, C. Shepard, J. Aldonas, J. Constanz Re: Loan Default Call 4/20/13

Exhibit 7          Defendant's Trial Exhibit 13 – Email Chain Between A. Doost, J. Constanz, C. Shepard, J. Aldonas Re: Update on Zulmai, Atifi, Afghan Pharma Meeting for Sale of Loan 10/01/2013

Exhibit 8          Government's Trial Exhibit 813 – OPIC Notice of Sale of Loan to Green Gate Trading, FZE, Sent to Equity Capital Mining, defendant, et al, dated July 17, 2014

Exhibit 9          OPIC Action Memorandum

Exhibit 10        Greengate Asset Inventory List

Exhibit 11        Greengate Bill of Sale

Exhibit 12        Government's Trial Exhibit 301 – Email from Defendant to J. Aldonas Stating No Affiliated Transactions

Exhibit 13        Full Email Chain Showing Ambiguous Exchange from Government's 301

Exhibit 14        Government's Trial Exhibit 39 – Loan Agreement, February 19, 2010

Exhibit 15        HLB Audit 2010

Exhibit 16        HLB Audit 2011

Exhibit 17        HLB Audit 2012

Exhibit 18      Greengate Verification with Serial Numbers

Exhibit 19      2017 Letter from Greengate Confirming Equipment Received

Exhibit 20      Accountant's Introductory Letter Explaining Findings

Exhibit 21      Spreadsheet Showing Invoices

Exhibit 22      Spreadsheet Showing Documents

Exhibit 23      Government's Trial Exhibit 1 – GM Proforma Invoice 0349-09

Exhibit 24      Government's Trial Exhibit 2 – GM Proforma Invoice 0349-09/B

Exhibit 25      Government's Trial Exhibit 3 - GM Proforma Invoice 0349-09/A

Exhibit 26      Government's Trial Exhibit 4 - GM Shipping Invoice re. 0349-09/B

Exhibit 27      Government's Trial Exhibit 5 – GM Account Statement

Exhibit 28      Government's Trial Exhibit 7 – GM Reward Agreement

Exhibit 29      Government's Trial Exhibit 502 – GM Proforma Invoice 0349-09/B Submitted to ASMED/DAI in Support of $400,000 Grant Application

Exhibit 30      Government's Trial Exhibit 503 – GM Letter, October 4, 2009, Providing Bank Account Information to ASMED/DAI Referencing Proforma Invoice 0349-09/B

Exhibit 31      Government's Trial Exhibit 604 – Pages from GM Proforma Invoice 0349-09/A Submitted By Defendant in Support of ARFC Loan Application

Exhibit 32      Government's Trial Exhibit 605 – GM Declaration Letter Re Accepting Payment in Marble Blocks, Referencing Proforma Invoice 0349-09/A

Exhibit 33      Emails from Samiullah Dawoody Showing Personal Knowledge

Exhibit 34      SIGAR's Interview with Col. Brittain, February 21, 2018

Exhibit 35      Col. Brittain Emails

Exhibit 36      SIGAR's Interview with Reott, March 17, 2018

Exhibit 37      Investigative Report, Simone, April 16, 2015

# PROCEDURAL HISTORY

On June 7, 2017, Doost was charged by Indictment (R. 1) with the following: Counts I –

III: Three counts of Major Fraud against the United States in violation of 18 U.S.C. §§ 1031(a)

and 2; Counts IV – XI: Eight counts of Wire Fraud in violation of 18 U.S.C. § 1343; Counts XII

– XIII: Two counts of False Statement on Loan Application or Extension in violation of 22

U.S.C. § 2197(n) and 18 U.S.C. § 2; Counts XIV – XV: Two counts of False Statement on Loan

Application or Extension in violation of 22 U.S.C. § 2197(n); Counts XVI – XXIII: Eight counts

of Money Laundering in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 2; and forfeiture

allegations under 18 U.S.C. §§ 981(a)(1)(C) and 982(a)(1) and 28 U.S.C. § 2461(c).

The Government alleged that Doost submitted his first loan disbursement request on

April 18, 2010. (R. 1). Thereafter, the Government alleged that Doost, for the "purposes of

executing" a "scheme to defraud," used wires to transmit funds, in violation of 18 U.S.C § 1343,

to various accounts on the following dates: Count IV-VI on April 30, 2010; Count VII-X on July

21, 2010; and Count XI on December 12, 2010. *Id*. Further, the Government alleged that Doost

made false statements on loan applications, under 22 U.S.C. Section 2197(n): Count XII –

between April 18, 2010 and April 30, 2010; Count XIII – between April 18, 2010 and April 30,

2010; Count XIV – July 15, 2010; and Count XV – December 12, 2010. Id. Lastly, the

Government alleged that Doost committed various financial transactions amounting to money

laundering under 18 U.S.C. §§ 1956(a)(1)(B)(i) and (2) on the following dates: Count XVI –

May 2, 2010 through May 6, 2010; Count XVII – May 5, 2010; Count XVIII – July 22, 2010;

Count XVIIII – July 24, 2010; and Count XX – July 27, 2010.

Doost pled not guilty to all charges. On September 24, 2018, after a jury trial and three

and a half days of deliberations, the jury found Doost guilty of Counts I – XX in the indictment

and not guilty of Counts XXI – XXIII. (R. 53).

Shortly thereafter, Doost sought to retain new counsel for purposes of post-trial motions and sentencing, and hired Glenn Seiden and Seiden Netzky Law Group, LLC ("SNLG") for such purpose. On October 26, 2018, Doost's trial attorneys' Kevin B. Ross, Tiffany A. Talamantez, and Solomon Wisenberg filed their Motion to Withdraw. (R. 72). On November 5, 2018, Glenn Seiden of SNLG filed his Motion for Leave to Appear Pro Hac Vice. (R. 74). On November 5, 2018, this Court granted both the Motion to Withdraw and the Motion for Leave to Appear Pro Hac Vice. (Minute Order – November 5, 2018).

## STATEMENT OF FACTS

Defendant, Azam Doost, also known as Adam Doost, is a dual Afghan and United States citizen. Doost and his brother, Nasim Doost ("Nasim"), were equal partners in a white marble mining venture near Herat, Afghanistan called Equity Capital Mining ("ECM"). In or about 2006, ECM obtained a 10-year lease from the Afghanistan Ministry of Mines for the rights to mine marble at the White Dove Marble Mine (the "Marble Mine") located in Chisht-i-Sharif, Afghanistan.

ECM was a subsidiary of Equity Capital Group, located and headquartered in Dubai, United Arab Emirates ("UAE"), an umbrella corporation facilitating the logistics and sales operations of marble mining and marble finishing throughout the world. Equity Capital Trading, also owed by Doost and Nasim, was another subsidiary of Equity Capital Group. Equity Capital Group also owned the Marble Factory, of which Doost was President.

The Marble Factory began excavating marble in May of 2011. Beginning in or about June 2009, Doost obtained loans and grants from ARFC and ASMED/DAI to pay for equipment needed at the Marble Factory and the Marble Mine. During and throughout this time period,

Doost set up various companies in Afghanistan to assist with logistics, importing and exporting, and to develop the mining industry within Afghanistan.

On or about November 1, 2009, Doost submitted a loan application with the Overseas Private Investment Corporation ("OPIC") in the amount of $15,800,000. The project was to be funded half by OPIC and half by ECM.

On or about February 19, 2010, Doost executed the loan agreement (the "Loan Agreement") with OPIC, in the amount of $15,800,000, with a total project value of $31,470,000. The approximate term of the loan was seven years, which amounted to roughly the same amount of time left on ECM's lease of the Marble Mine. Once the loan was executed, Doost and Nasim submitted to OPIC, via email or in person, three disbursement requests on or about the following dates: April 18, 2010 for $7,000,000; July 15, 2010 for $7,000,000; and November 28, 2010 for $1,800,000.

With each disbursement request, Doost and his consultant Majood Popal ("Popal") were required, per the loan agreement, to submit invoices to substantiate their expenses. OPIC would then wire certain funds directly to the requested vendors or to ECM (if ECM had requested funds for its own working capital). Often, even after receiving the loan proceeds for various pieces of equipment, ECM would have to wait months for shipping and importation to occur.

The Marble Factory began to experience extreme pressures on the operations of the business such as thefts, kidnappings, and bombings from Taliban and other extremists within the region. (**Exhibit 1**). Further, deterioration of the road from the Marble Mine to the Marble Factory made the movement of marble almost impossible. *Id.*

After several years of trying to combat these obstacles, Doost, unable to continue payments, went into default with his loan with OPIC. Thereafter, OPIC sent a notice that they

would be foreclosing on the loan. (**Exhibit 2**). Doost made multiple attempts to resolve the loan

and work with OPIC to keep the project going. (**Exhibits 3-6**). After the loan default, in or about

October of 2013, OPIC and Doost began to explore the prospect of selling the loan and the

operations to a third party named Greengate. (**Exhibits 7-8**).

      Unbeknownst to Doost at the time, Greengate had proposed two offers to OPIC for the

sale of the loan: (1) $2,464,722 upfront or; (2) $8,000,000 over eight years. (**Exhibit 9**). OPIC

chose the former, selling the loan to Greengate for $2,464,722. (**Exhibit 9**).

      Doost assisted with the transition, allowing Greengate to conduct due diligence on the

Marble Mine and Marble Factory. Part of that due diligence was an audit and an accounting of

the operation's assets. The parties conducted that audit, memorializing their inventory on a

spreadsheet that contained the names of the equipment, serial numbers, models, plate numbers,

and quantities. This inventory asset sheet was signed by Doost and a representative from

Greengate, attesting to the presence of the various pieces of equipment either at the Marble Mine

or the Marble Factory. (**Exhibit 10**).

      After due diligence, on or about December 27, 2013, Doost and Nasim sold their 65%

interest in ECM to Greengate for approximately $480,000. (**Exhibit 11**). Additionally, Greengate

agreed to assume all outstanding debt, totaling approximately $21,489,069, and any acquired

assets, including those on the asset list. Accordingly, the value of the company, on the day of the

sale, was approximately $33,800,000.

      On June 7, 2017, the Government returned an indictment alleging that Doost had

defrauded OPIC out of the full value of the loan: $15,800,000. (R. 1). The Government's theory

was that Doost had created shell companies in Afghanistan and Dubai for the purpose of

diverting loan proceeds for his own use. (R.1). Part of the allegations against Doost were that

many items of equipment were never actually purchased and that Doost had pocketed the funds. (R.1). Further, the Government alleged that Doost had made various false statements to OPIC, failed to disclose affiliate companies, and laundered money throughout various bank accounts in Afghanistan, Dubai, and the United States. (R.1).

## LEGAL STANDARD

Federal Rule of Criminal Procedure 29 provides that the Court must enter a judgment of acquittal on any offense charged for which the evidence is insufficient to sustain a conviction. FED. R. CRIM. P. 29. In ruling on a motion for judgment of acquittal, the Court must "consider[ ] the evidence in the light most favorable to the government and determin[e] whether, so read, it is sufficient to permit a rational trier of fact to find all of the essential elements of the crime beyond a reasonable doubt." *United States v. Kayode,* 254 F.3d 204, 212–13 (D.C. Cir. 2001) (quoting *United States v. Harrington,* 108 F.3d 1460, 1464 (D.C. Cir. 1997)). "The question is whether the evidence is sufficient for a rational juror to have found the defendant guilty." *United States v. Naegele*, 537 F. Supp. 2d 36, 38 (D.D.C. 2008).

Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." FED. R. CRIM. P. 33(a). "Interest of justice," within the D.C. Circuit, has been interpreted so as to mean that "granting a new trial motion is warranted only in those limited circumstances where 'a serious miscarriage of justice may have occurred.'" *United States v. Thompson*, 275 F. Supp. 3d 107, 111 (D.D.C. 2017). Whether to grant a new trial is "committed to the sound discretion of the trial judge…" *United States v. Reese*, 561 F.2d 894, 902 (D.C.Cir.1977).

Under Rule 33, a district court is authorized to scrutinize and set aside a jury verdict much broader than the Rule 29 power to grant a motion for judgment of acquittal. *United States*

*v. Kellington*, 217 F.3d 1084, 1097 (9th Cir. 2000). Unlike under Rule 29, a trial court deciding a Rule 33 motion is not "obliged to view the evidence in the light most favorable to the verdict, and it may weigh the evidence and evaluate for itself the credibility of the witness." *Id*. The burden of demonstrating that a new trial would be "in the interest of justice," rests with the defendant. *United States v. Mangieri,* 694 F.2d 1270, 1285 (D.C.Cir.1982).

## ARGUMENT

**I.    As a Matter of Law, this Court Should Enter a Judgment of Acquittal on Count XV.**

As to Count XV – False Statement on Loan Application or Extension in violation of 22 U.S.C. § 2197(n), Doost moves for a judgment of acquittal on the ground that the prosecution has failed to present sufficient proof from which any rational juror could conclude beyond a reasonable doubt that Doost is guilty.

The exchange that Doost's alleged "false statement" is predicated on was "fundamentally ambiguous" such that a rational juror could not have found Doost guilty beyond a reasonable doubt. Further, the Government's exhibit purporting to evince the false statement in Count XV was misleading since it omitted—entirely—the context of the e-mail conversations, to which Doost responded. (**Exhibit 12**). As a result, the jury was privy only to Doost's response and not the exchange or the context to which Doost responded.

**A.    Doost's Alleged False Statement was in Response to an Exchange So Fundamentally Ambiguous That No Rational Juror Could Have Convicted Him.**

False statement charges "require that a witness believe that the [statement] he gives is false. Thus, whether the witness believes that an answer is true or false generally turns on the declarant's understanding of the question." *United States v. Naegele*, 341 B.R. 349, 355 (D.D.C. 2006) quoting *United States v. Lighte*, 782 F.2d 367, 372 (2d Cir.1986) (internal quotations

omitted); see also *United States v. Culliton*, 328 F.3d 1074, 1080 (9th Cir.2003) (conviction requires that the defendant believe that the testimony he gives is false).[1] Accordingly, a Defendant cannot, as a matter of law, be convicted of making a false statement on the basis of an answer to a question that is "excessively vague" or "fundamentally ambiguous." *Naegele*, 341 B.R. at 355 quoting *Culliton*, 328 F.3d at 1078; see also *United States v. Camper*, 384 F.3d 1073, 1076 (9th Cir.2004). The answer to a fundamentally ambiguous question may not, as a matter of law, form the basis for a false statement, *United States v. Sarwari*, 669 F.3d 401, 407 (4th Cir. 2012), and the jury is not permitted to guess as to the meaning the defendant ascribed to a question. *United States v. Martellano*, 675 F.2d 940, 946 (7th Cir.1982).

"A question is 'fundamentally ambiguous' when it 'is not a phrase with a meaning about which men of ordinary intellect could agree, nor one which could be used with mutual understanding by a questioner and answerer unless it were defined at the time it were sought and offered as testimony.'" *Naegele*, 341 B.R. at 355 quoting *United States v. Lattimore*, 127 F.Supp. 405, 410 (D.D.C.), *aff'd* 232 F.2d 334 (D.C.Cir. 1955). Quite simply, a question is not entitled to be interpreted by a jury "when it is entirely unreasonable that the defendant understood the question posed to him." *Naegele*, 341 B.R. at 355. The inquiry is "fact-specific" and the court may not consider the question in isolation and *must* look to the context of the question and answer as well as extrinsic evidence that may be relevant to the defendant's understanding of the question posed. *Id.* at 356 (emphasis added).

The Government's indictment charged Doost with making a False Statement on Loan Application or Extension under 22 U.S.C. § 2197(n). (R. 1). Specifically, Count XV of the Government's indictment alleges that on December 13, 2010 that Doost falsely stated that

---

[1] The doctrine of "fundamental ambiguity" is a defense that applies to false statement statutes as well as perjury statutes. *United States v. Naegele*, 341 B.R. 349, 353 (D.D.C. 2006).

"[t]here were no affiliate transaction that occurred during the quarter ending September 30, 2010." (R. 1). The Government alleges that statement was made "when in truth and fact" Doost knew that he had affiliations with "Afghan Stone, Saheb Zada, Big Five and Diversified World Trading during the quarter ending September 30, 2010." (R. 1).

The final jury instructions provided that: "[u]nder Section 2197(n), it is a federal crime to knowingly make a false statement or report for the purpose influencing in any way the action of the Overseas Private Investment Corporation ("OPIC") with respect to any loan or any change or extension of any such loan." (R. 58). However, context and all extrinsic evidence pertinent to the alleged false statement was never presented to the jury because the Government omitted those facts. (*See* **Exhibit 12**).

Of many of the lengthy e-mail chains proffered by the Government in other exhibits, Gov.'s Exhibit 301 was the only one to be "cropped" away in image form, as opposed to PDF, to show *only* the Defendant's response to what was a confusing, lengthy, and "fundamentally ambiguous" exchange. *United States v. Bailey*, 322 F. Supp. 3d 661, 674 (D. Md. 2017); Fed R. Evid. 106 ("[i]f a prosecutor introduces an incomplete version of the defendant's written or oral statement to the investigating officers by eliciting only the inculpatory portions, while leaving out exculpatory ones that, in fairness, would paint a more complete picture and dispel a misleading impression that the jury may have reached having heard only the incomplete portions, then the defendant is at a serious disadvantage"). (**Exhibit 12**). The reasons set forth below exemplify and explain the Government's tactics, upon closer look of the e-mail exchange.

The e-mail exchange which brought forth the alleged false statement began with Doost initiating and presenting what he called his "Affiliate Transaction Report" between ECM and the Marble Factory to John Aldonas ("Aldonas"), a representative from the Overseas Private

Investment Corporation ("OPIC"). This "Affiliate Transaction Report" was an attached, forward-looking, projection of "anticipated" transactions between ECM and the Marble Factory. (Exhibit 13). Aldonas responded to Doost's submission with the following:

> Adam,
>
> Your attachments look like a forward looking list of 2011 affiliated transactions between ECM and your marble finishing company.
>
> Perhaps I have confused things, but we are looking for you to certify quarterly, along with quarterly financial statements, whatever affiliated transactions have taken place in that accounting period, and that they have taken place on an arms-length basis (with the evidence of this being the sales and volume detail along the lines you have just provided for 2011). If it is the case – since for example the marble finishing operations is not yet processing material – then you could simply certify for the quarter ending Septbmer [sic] 30, 2010, that there were no Affiliated Transactions. That said, I would ask that you carefully read the definition of Affiliated Transactions so you can consider what if any types of transactions might fit the reportable category.
>
> ***
>
> Thanks,
>
> John

(**Exhibit 13**).

Defendant then responded: "[t]here is no affiliate transaction have accurred [sic] during the quarter ending september 30 2010 [sic]."

First, looking to whether "defendant and his questioner joined issue on a matter of material fact to which the defendant knowingly uttered a false declaration," *United States v. Jiang*, 476 F.3d 1026, 1029 (9th Cir. 2007), it is nearly impossible to tell what the precise question was or to which question Defendant was responding. Aldonas' questions, statements, or explanations are ambiguous.

For example, his first statement seems to discredit Doost's "forward-looking" list but then seemingly explains that he is looking for affiliated transactions in "that accounting period,"

without regard to a particular time period. See *United States v. Strohm*, 671 F.3d 1173, 1180 (10th Cir. 2011) ("[b]ecause no witness—let alone a court reviewing a cold appellate record—could know without further definition what temporal period the question referred to, there was no way to determine if the witness's answer was knowingly false"). Aldonas then seems to further indicate that the e-mail attachment offered by Doost in his "forward-looking" projection for 2011 might actually suffice his request. To further complicate things, Aldonas next tells Defendant that "if it is the case" (assumedly "case" meaning that that the Marble Factory is "not yet processing material") that Doost could just "simply" state, that for the quarter ending September 30, 2010, that "there were no Affiliated Transactions." Lastly, Aldonas refers Doost to the definition of "Affiliated Transactions." However, notwithstanding the definition of "Affiliated Transactions," Aldonas implies that Doost can "simply" disregard that definition if there has not yet been transactions between ECM and the Marble Factory. Whichever statement, if any, could plausibly be understood by Doost, it is not clear to which statement Doost's alleged false statement was in response to. It is therefore "entirely unreasonable" for Doost to have understood what the precise question or statement was before him. *Naegele*, 341 B.R. at 355.

Second, viewing the above exchange in the context of the question and answer, as well as any extrinsic evidence that may be relevant to the defendant's understanding of the question posed, requires careful consideration that Doost exhibits a weak proficiency in the English language. *Jiang*, 476 F.3d at 1030 (alleged false statements must consider the language barrier that existed between the questioner and answerer).

In *Jiang*, a Chinese citizen was convicted of making a false statement to a Special Agent from the Office of Export Enforcement, in violation of 18 U.S.C. § 1001(a). *Id.* at 1027. Jiang was the subject of an investigation after he contracted with a California manufacturer to ship

nine microwave amplifiers to an entity in China. *Id*. Because the entity in China was affiliated with the Chinese military, the Office of Export Enforcement interviewed Jiang to learn more about the transaction. *Id*. Jiang initially shipped the first four of the nine amplifiers to the Chinese entity. *Id*. Subsequently, the Chinese entity communicated to Jiang that it could not use the four amplifiers that had been shipped but that it could use three of them in another project. *Id*. The Chinese entity then told Jiang not to ship the remaining five amplifiers. *Id*. at 1028. Jiang then returned the six unused amplifiers back to the California manufacturer. *Id*. During an interview with the Special Agent, Jiang told the agent he had returned "the product" back to the California company. *Id*. However, the Special Agent did not ask whether Jiang meant that all nine amplifiers had been returned or whether any of the amplifiers had been shipped to the Chinese entity pursuant to the contract. *Id*. The Special Agent testified that he knew at the time of the interview that nine amplifiers were involved in the transaction. *Id*. The Special Agent then inquired about the transaction with the California manufacturer who relayed that Jiang had returned only six of the nine amplifiers. *Id*. Jiang was subsequently indicted for unlawfully exporting goods and with intentionally making a false statement to a federal agent. *Id*.

The appellate court held that the district court had failed to "sufficiently account for the context in which defendant's statements were made and also failed to account for the numerous extrinsic facts that weighed against a conviction. *Id*. at 1029. Specifically, the court failed to account for the fact that the defendant could have understood the Special Agent to be referring to a singular shipment of amplifiers, not the entire lot. *Id*. Further, that the defendant's statements could not be properly evaluated without considering his proficiency in English, which was "limited." *Id*. To that end, the court noted that the defendant's English was "certainly limited enough" as to doubt whether he and the Special Agent had a "common understanding of the

grammatical fine points of the questions that were asked and the answers that were given." *Id*. Most importantly, the court held that "the government cannot sustain a materially false statement charge based merely on the government agent's interpretation of what the individual meant – there must be clear evidence of what was said and a full appreciation of the context in which the statement was made." *Id*. at 1030. And finally, the court held that the record had reflected that "the exchange was, at best, ambiguous. The context of the question and other extrinsic evidence made it impossible to 'conclude beyond a reasonable doubt that the defendant understood the question as did the government and that, so understood, the defendant's answer was false.'" *Id*. quoting *United States v. Sainz*, 772 F.2d 559, 562 (9th Cir. 1985).

Here, as in *Jiang*, Doost unquestionably exhibits a limited proficiency in the English language as demonstrated by the e-mail exchange in question as well as other exhibits demonstrating Doost's English communication skills, particularly in email exchanges. Further, there is no doubt that Aldonas' questions or statements to Doost were fundamentally ambiguous in that there was no common understanding of the grammatical fine points pertaining to "Affiliated Transactions." This is evidenced by Defendant initially sending a forward-looking projection of 2011 "Affiliate Transactions" when Aldonas was, ostensibly, trying to obtain historical transactions. (**Exhibit 13**).

Doost's understanding, or lack thereof, could have only been worsened after the confusing e-mail exchange with Aldonas. Doost could have understood Aldonas as stating that if there we're no transactions between ECM and the Marble Factory then he could "simply" respond that there we're no affiliated transactions for the quarter ending September 30, 2010. In any case, there was no "full appreciation" for the context in which the exchange occurred or how Doost may have interpreted it. *United States v. Farmer*, 137 F.3d 1265, 1269 (10th Cir. 1998);

*United States v. Glantz*, 847 F.2d 1, 7 (1st Cir.1988) (convictions for arguably untrue answers to vague or ambiguous questions, when there is insufficient evidence of how they were understood by the witness, cannot stand as a matter of law). This point is furthered and acknowledged by the Government, who creatively cropped Doost's statement, out of the ambiguous context, and presented only Doost's response to the jury. *Farmer*, 137 F.3d at 1270 ("[t]he Government simply did not offer any evidence to suggest what the question meant to Defendant when she answered it. Only by surmise and conjecture could the jury conclude that Defendant understood the question as the prosecutor did").

Finally, Doost's alleged false statement, in which grammar and spelling are obviously lacking, arguably reads two different ways: (1) "no affiliate transaction have occurred" or (2) "no affiliate transaction have accrued." Both meanings have drastically different consequences under the relevant statute. Either way, the exchange was "fundamentally ambiguous" and the appropriate remedy would have been to use a "minimum level of clarity and specificity" and "not a criminal prosecution." *Id.* quoting *Sainz*, 772 F.2d at 562; see also *United States v. Baker*, 626 F.2d 512, 515-16 (5th Cir.1980) (false statement requires "that the defendant knowingly made a false statement with intent to deceive" which excludes "false statements made by inadvertence, mistake, [or] carelessness"); *United States v. Robison*, 505 F.3d 1208, 1229 (11th Cir. 2007) (same).

Looking to the context of the exchange upon which Doost's alleged false statement is predicated, it is impossible to decipher any cognizable statement to which Doost responded to. The exchange was so vague in its communication to Doost that it cannot be reasonably said that Doost understood what was expected of him. At best, the exchange was "fundamentally ambiguous." Further, the lens through which to view the exchange was blurred by Doost's lack

13

of a commanding grasp of the English language. The jury is not entitled to "guess" at the meaning of the exchange since it was so "fundamentally ambiguous." This is precisely why the Government cropped Doost's statement completely out of context before presenting it to the jury. As a matter of law, no rational juror could have convicted Doost since there was obviously no "common understanding of the grammatical fine points of the questions that were asked and the answers that were given." *Jiang*, 476 F.3d at 1029. As such, this Court should grant Doost a judgment of acquittal as to Count XV of the indictment.

## II. Doost Received Ineffective Assistance of Counsel at Many Critical Stages of Trial in Violation of His Sixth Amendment Rights.

Doost's trial counsel was constitutionally ineffective on several fronts including: (1) failing to proffer evidence that would have shown that—most if not all—equipment alleged to have not been purchased, in furtherance of the alleged scheme to defraud, was present and accounted for at the Marble Mine and Marble Factory in a subsequent sale to a third party; (2) failing to challenge the indictment's statute of limitations on several grounds; (3) failing to challenge the indictment as multiplicitous; (4) failing to object to the admission of foreign business documents that were obtained from an untrustworthy source; (5) failing to investigate and/or call several available and crucial defense witnesses; (6) failing to proffer imperative evidence which led to conviction on Count XV – False Statement on a Loan Application of the indictment; and (7) failing to object or offer alternatives to improper and confusing jury instructions/verdict forms.

A defendant claiming ineffective assistance of counsel must show (1) "that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms," and (2) "that this error caused [him] prejudice." *United States v. Hurt*, 527 F.3d 1347, 1356 (D.C. Cir. 2008) (citation omitted). Thus, a defendant must show "that there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington*, 466 U.S. 668, 694 (1984). In evaluating prejudice, the ultimate question is whether the defendant has shown a reasonable probability that adequate investigation would have enabled trial counsel to strew sufficient doubt as to sway even "one juror." *United States v. Mohammed*, 863 F.3d 885, 892 (D.C. Cir. 2017).

A.      **Trial Counsel Failed to Submit and Consider Two Separate and Independent Audits That Refuted the Government's Argument That Defendant Had Not Purchased Certain Items of Machinery and Instead Had Taken Loan Funds for His Own Personal Use.**

Doost's counsel was privy to a number of documents that refuted the Government's theory that Doost had created various shell corporations for the sole purpose of defrauding the Government by diverting loan proceeds for his own use. Doost's trial counsel was in possession of three separate audits of ECM performed by HLB Ijaz Tabussum & Co. ("HLB"), chartered accountants, who were contracted through KPMG, per the Loan Agreement. (**Exhibit 14**). HLB had conducted audits beginning in 2010 and continued into 2012. HLB's documents showed the value of ECM's assets during the relevant time period negated the Government's theory that certain equipment was never purchased and that Doost had been diverting the loan proceeds for his own benefit. The audits prepared by HLB shows that ECM had assets valued at $23,674,000 million in 2010; $25,373,000 million in 2011; and $25,381,000 million in 2012. (**Exhibits 15-17**).

In addition to the HLB audits, trial counsel also had in his possession the bill of sale documenting the sale of ECM to Greengate Group ("Greengate") in 2014. These documents were prepared by Greengate, not the Defendant. Before executing and completing the purchase,

Greengate sent personnel physically to Marble Mine and Marble Factory to conduct due diligence on the operation and to assemble a list of physical assets, among other tasks.

As the purchaser of those assets, Greengate had every incentive to conduct a true and accurate inventory. These documents show that numerous pieces of equipment – equipment that the Government alleged were never purchased – were in fact both present and accounted for at ECM in 2014. (**Exhibit 10, Exhibit 18-19**).

Further, trial counsel had a copy of a contract showing the Doost and Nasim had sold their 65% interest in ECM to Greengate for $480,000, plus the debt owed to OPIC and any other acquired assets. (**Exhibit 11**). Taking into account the value of the equipment physically present, the value of the company, on the day of sale, was $33,800,000 – nowhere close to the $2,400,000 claimed by the Government at trial: "And think about the due diligence that Green Gate did. So they went to the Marble Mine, they looked at the financials, they kicked the tires on this operation, and they valued it at $2.4 million -- present value of $2.4 million." (Tr. 1269). Trial counsel failed to proffer the evidence in his possession that would have completely rebutted the Government's theory that: (1) the value of the company was only $2.4 million; and (2) that Doost had pocketed loan proceeds which were to be put toward equipment.

For such a rebuttal, trial counsel had pictures, import documents, inventory lists, audit reports from two sources, and a willing and able witness (ECM's CFO) who would have been able to testify, line by line, as to each piece of equipment that was accounted for. This evidence would have shown the jury the process for acquisition of each piece of equipment: (1) the invoice, (2) the importation and tax document, (3) a picture of the equipment at the Marble Mine or Marble Factory, (4) the internal audits conducted by ECM's CFO, (5) the external audits conducted by HLB, and finally, (6) the bill of sale inventory sheet from ECM to Greengate.

Current counsel was able to, with the same documents that trial counsel had in his possession, have forensic accountants compose a document showing that most, if not all, of the equipment alleged to have never been purchased was accounted for in the sale to Greengate. (**Exhibits 20-22**). The forensic accountants were able to account, with only these documents, for $14,961,608 of the $15,800,000 OPIC loan.[2] (**Exhibits 20-22**). This, of course, makes sense since Greengate would have balked at an operation with few or no assets which they purchased for nearly $33,800,000.

It is mind-boggling to think that trial counsel utterly failed to proffer this evidence that refutes the Government's entire case. This was objectively unreasonable, and any competent trial counsel would have either presented this evidence or employed an expert to do so. *Hinton v. Alabama*, 571 U.S. 263 (2014) (failure to replace an inadequate expert amounted to deficient performance). Had trial counsel thought to use an accounting expert or even proffer simple evidence showing that equipment was accounted for there is more than a reasonable probability that the outcome of the trial would have been different. Without a loss of OPIC funds which were alleged to have gone into Doost's pocket, the Government's case fails on many levels. Most importantly, however, is that the loan proceeds were used to purchase equipment which, in the eyes of the jury, would have completely negated intent. As such, Doost was prejudiced by trial counsel's failure to proffer this imperative evidence or to proffer any sort of defense whatsoever. Accordingly, this Court should reverse Doost's convictions and grant a new trial.

---

[2] Due to the timeline, the forensic accountants have not been able to review every relevant document, and on information and belief, after review of the remaining documents, they will be able to account for some if not all of the remainder of the monies.

**B.      Trial Counsel Failed to Challenge the Indictment on Statute of Limitations Grounds.**

Generally, no apparent or plausible tactical decision may explain counsel's failure to move for dismissal of an untimely indictment. *United States v. Palomba*, 31 F.3d 1456, 1466 (9th Cir. 1994). Failure to consider whether the statute of limitations was a viable affirmative defense is an objectively *unreasonable* performance. *United States v. Wilkins*, No. CR 13-267 (JDB), 2017 WL 2458904, at *4 (D.D.C. June 6, 2017), aff'd, 734 F. App'x 1 (D.C. Cir. 2018), cert. denied, 139 S. Ct. 347 (2018) (emphasis added).

Here, had trial counsel even considered moving to dismiss the indictment on statute of limitations grounds, there is a reasonable probability that at least some of the claims would have been dismissed with prejudice. *Weathers*, 493 F.3d at 238. As explained in Section III(B) *infra*, Count I of the major fraud counts were brought fifty days outside of the statute of limitations. (R. 1). Further, the alleged major fraud counts should have been brought in one count since they were not separate alleged schemes. Thus, had trial counsel argued so, it is likely that at least one of the major fraud counts, if not all, would have been dismissed with prejudice and the Government would have been barred from further prosecution. *Young v. Dretke*, 356 F.3d 616, 619 (5th Cir. 2004) (conviction could not stand because it resulted from ineffective assistance of counsel; constitutionally effective counsel would have moved to dismiss the indictment); *Sylvester v. United States*, 868 F.3d 503, 510 (6th Cir. 2017) (failure to raise a meritorious claim regarding violations of the Speedy Trial Act, was constitutionally deficient).

Thus, these redundant and untimely charges would not have gone to the jury and tainted their decision-making into thinking that Doost had committed several different crimes; this alone "posed significant threats to the proper functioning of the jury." *Clarridge*, 811 F.Supp. 697 at 702. Had trial counsel even attempted to discuss with Doost the statute of limitations or even

investigated the possibility of a challenge, there would not have been "deficient performance" on trial counsel's part. *Wilkins*, 2017 WL 2458904, at *8. This did not occur.

Even aside from the prejudicial taint to the jury, trial counsel's performance was inherently prejudicial because the failure to challenge these counts as untimely resulted in the additional stigma of an improper conviction which may now be used prospectively to impeach Doost's credibility in future proceedings. *Palomba*, 31 F.3d. at 1465.

In sum, failing to challenge the indictment on statute of limitations grounds was constitutionally deficient performance that prejudiced Doost to such a degree that it cannot be said that he had a fair trial. *Wilcox v. McGee*, 241 F.3d 1242, 1246 (9th Cir. 2001) (trial counsel was constitutionally ineffective for failing to move to dismiss the indictment on double jeopardy grounds and prejudice resulted from subsequent conviction). Accordingly, this Court should reverse Doost's convictions and grant a new trial.

### C. Trial Counsel Failed to Challenge Several Portions of the Indictment as Multiplicitous.

Trial counsel's failure to object to the multiplicitous indictment prejudiced Doost in the eyes of the jury, resulted in an additional and unwarranted conviction, and has exposed Doost to additional future harm from the stigma associated with the additional convictions. Failure to object to or move to dismiss defective counts within an indictment is deficient performance under *Strickland*. *United States v. Jones*, 403 F.3d 604, 606-07 (8th Cir. 2005) (a reasonably competent lawyer would have challenged the indictment as multiplicitous; finding deficient performance and prejudice); *United States v. Bankston*, 820 F.3d 215, 234 (6th Cir. 2016) (same); *Joseph v. Coyle*, 469 F.3d 441, 462 (6th Cir. 2006).

Here, trial counsel failed to address two pertinent defects in the indictment: (1) the multiplicitous charges of major fraud spread out over Counts I-III; and (2) the multiplicitious

charges for false statements where both were made within the same document in Counts XII and XIII. *See* Sections III(B) and (C), *infra*. Failure to do so amounts to deficient performance since "any reasonably competent lawyer" would have challenged indictment as multiplicitous. Clearly, the failure of trial counsel to do so prejudiced Doost before the jury. *Clarridge*, 811 F.Supp. 697 at 702 ("…the law protects an individual against multiplicitous indictments to avoid multiple sentences for a single offense and to eliminate the prejudice which such indictments may generate in the eyes of a jury…").

Beyond the prejudice flowing to the jury, which likely undermined their determinations, prejudice results not only from the length of sentencing but also from the additional conviction itself, the possibility of increased *future* sentences, the imposition of fines, and the fact that a defendant's credibility may be impeached in future proceedings. *Jones*, 403 F.3d at 607; *United States v. Lyles*, No. CIV.A. 05-554 (JDB), 2006 WL 1466843, at *1 (D.D.C. May 25, 2006). Accordingly, Doost's trial counsel was constitutionally deficient in failing to challenge the indictment as multiplicitous. But for trial counsel's deficient performance, there is a reasonable probability that Doost would not have been—as a matter of law—convicted of an additional false statement. This Court should reverse Doost's convictions and grant a new trial.

### D. Trial Counsel Failed to Object to the Admission of Foreign Business Documents from an Untrustworthy Source.

Trial counsel failed to object to the admission of foreign business documents, as untrustworthy, that were instrumental for the Government in proving intent at trial. This thereafter prejudiced Doost before the jury and resulted in conviction.

Trial counsel neither submitted a Motion *in Limine* nor objected to the admission of *any* documents derived from Gaspari Menotti, an inherently untrustworthy source. The documents admitted from Gaspari Menotti were used not only for trial testimony but were also part of a

foundation in the Government's argument for the admission of "other acts," namely, the other loan applications to ARFC and ADMED/DAI. These "other acts" were instrumental in the Government demonstrating intent.

However, the admission of the "other acts" evidence was not the most damning. It was the introduction of the foreign business documents, which were inherently untrustworthy, that prejudiced Doost the most. The Government contended that "[m]uch of the evidence is supported by the [foreign business] documents and would be discussed in testimony already taken in depositions in Italy." (R. 40). A reasonably effective trial counsel would have objected to the admission of foreign business documents that were inherently untrustworthy. The documents were not only the foundation of "other acts" evidence in which the Government relied on to demonstrate intent; the documents themselves served as a major part of testimony during trial for almost all of the Government's witnesses including Carleen Watts and Cindy Shepard. The Government noted that "[y]eah, I believe that all of the witnesses that will be testifying about what's referenced [in the Gaspari Menotti documents] will also be testifying about the crimes in this case, with one exception, perhaps." (Tr. 6.). However, trial counsel didn't even put up a fight, "I don't, at this time, have really any legal objections to lodge against the 404(b) in regards to what they're seeking to try to admit it in for." (Tr. 8). The documents were sourced from Gaspari Menotti who was alleged to have altered documents and was also owed money by Doost. Clearly, trial counsel's performance fell below an "objective standard of reasonableness under prevailing professional norms," when he failed to object to the admission of these foreign documents as untrustworthy. *Hurt*, 527 F.3d at 1356.

Trial counsel's failure to object to the admission of untrustworthy foreign documents prejudiced Doost. The admission of the foreign documents, without challenge, enabled the

Government to introduce the "other acts" evidence to show intent. This Court acknowledged that the Government needed these documents so as to "prove up the defendant's state of mind, and the fact that there are those parallel transactions involving similar conduct, similar entities and similar players, makes those events quite probative." (Tr. 12). The foreign documents obtained from Gaspari Menotti were used extensively by almost every witness the Government called; to prove intent which prejudiced Doost before the jury. (**Exhibits 23-32**). The jury relied on documents obtained from an untrustworthy source – a source that was alleged, even by the Government, to be altering documents and "generating" invoices outside of regularly conducted business activity.

It falls well below objective standards for trial counsel not to object to these unreliable documents that we're then used as "other acts" evidence against Doost in several different fashions. Considering the totality of trial counsel's performance, had the jury not been privy to the "other acts" evidence that was grounded upon the documents from Gaspari Menotti, or the variations of alleged invoices, there is a reasonable probability that the outcome of the trial would have been different. *See Strickland v. Washington*, 466 U.S. 668, 694 (1984). Accordingly, this Court should reverse Doost's convictions and grant a new trial.

E.     **Trial Counsel Failed to Call Several Imperative Witnesses Who Were Present and Available to Testify During Trial.**

The complete failure to investigate potential witnesses cannot be construed as a strategic decision on the part of defense counsel. *United States v. Mohammed*, 863 F.3d 885, 890 (D.C. Cir. 2017) citing *Reynoso v. Giurbino*, 462 F.3d 1099, 1112 (9th Cir. 2006). "Only when a reasonable investigation has been performed is counsel in a position to make informed tactical decisions." *United States v. Barbour*, 813 F.2d 1232, 1234 (D.C. Cir. 1987).

i. **Trial Counsel Failed to Call ECM's Chief Financial Officer to Testify as to the Inventory on Equipment Purchased and the Internal and External Audits Performed in Accordance with the Loan**

Trial counsel failed to call or even investigate the possibility of calling ECM's Chief Financial Officer ("CFO"), Samiullah Dawoody. Dawoody served as ECM's CFO from February 2012 until December 2013. Prior to ECM, Dawoody, a chartered accountant, was an accountant at ASMED/DAI, and a Finance Assistant at United Nations Mine Action Coordination Center for Afghanistan. After leaving ECM, Dawoody worked for the United States Embassy in Kabul, Afghanistan for over three years.

Dawoody had personal knowledge as to ECM's financials, balance sheets, inventory, and took part in both internal and external audits. (**Exhibit 33**). Dawoody would have provided testimony, along with the audits discussed *supra* to show that most, if not all, of the equipment the Government alleged was never purchased was actually present and accounted for either at the Marble Mine and Marble Factory. Along with the auditing evidence, Dawoody's testimony would have seriously called into doubt the Government's theory of the case: "THE COURT: I'm going to sustain the objection because it's just not clear to me that [Watts] would be able to trace any of this to the OPIC money, and that's all we really are here about." The Government's theory that the OPIC loan proceeds were diverted to shell companies and then into the pockets of Doost could have easily been refuted by Dawoody's testimony. The Government's theory was weak to begin with and had trial counsel acted competently, he would have seized the opportunity to counter that weakness through defense witness testimony:

Q: Would it be fair to say, though -- I mean, would you agree that if those were the conditions, that that's possible?

A: It's possible.

23

Q: And in the course of your investigation when you looked at the cash withdrawals that we just went through, it stops with the cash withdrawal; is that right?

A: Yes.

Q: And you can't tell the jury, based on your investigation, with all the resources that you have, that those funds were not used to purchase equipment, can you?

A: No, I can't say that.

Q: And it's very possible that those funds could have been used to purchase equipment, correct?

A: I have no knowledge what happened to that money.

Testimony of Watts (Tr. 913-914).

Dawoody's testimony would have revealed evidence that could have called the Government's theory into serious doubt; trial counsel's failure to conduct an appropriate investigation by consulting a witness with personal knowledge of the subject matter constitutes deficient performance. *See Young v. United States*, 56 A.3d 1184, 1199 (D.C. 2012), as amended (Jan. 10, 2013).

A competent attorney, aware of ECM's CFO whom was available to testify, would have called Dawoody to testify to rebut the Government's theory. Such testimony would have had a reasonable probability of at least swaying one juror—at least enough to raise a reasonable doubt. *Id.* Dawoody's testimony would have completely undermined the Government's theory that Doost pocketed OPIC loan funds and that the funds were diverted for his own use. Dawoody worked closely with HLB and Greengate to facilitate external audits, as per the Loan Agreement, and maintained the internal audits and financials for ECM. Dawoody was credible as an employee of the United States Embassy in Kabul, Afghanistan.

Without Dawoody's testimony, the jury was left pondering where the OPIC loan proceeds went to. The failure to call Dawoody was deficient performance and certainly prejudiced Doost in not presenting credible testimony to not only explain where the OPIC funds went to but also to negate intent, "the jury had no way to factor in the missing…evidence." *Mohammed*, 863 F.3d at 893.

Trial counsel's decision not to call Dawoody cannot be reasonably construed as a tactical decision since a reasonable investigation was never conducted. Trial counsel "did not decide against investigating based on any reasoned anticipation that the evidence unearthed or testimony of anyone he might reach would be of limited value or would be vulnerable on cross-examination." *Mohammed*, 863 F.3d at 891. Counsel did not investigate and/or did not understand the value of Dawoody's testimony. Accordingly, Doost's trial counsel was ineffective which caused Doost prejudice. Therefore, this Court should reverse Doost's convictions and grant a new trial.

### ii. Trial Counsel Failed to Call Colonel Thomas H. Brittain.

Trial counsel failed to call an extremely credible witness, who was present in the courthouse during the trial, in Colonel Thomas H. Brittain, who served as the Deputy Commander for International Security Assistance Force ("ISAF"), Regional Command West (RC-W), located at Camp Arena, Herat, Afghanistan, from July 2014 through August 2014. (**Exhibit 34**). Brittain was responsible for economic and security development throughout Afghanistan including in Herat where the Marble Mine was located. *Id.*

Brittain could have credibly testified to the security threats posed directly to the Doost operations – both the Marble Mine and Marble Factory – as well as the potential harm to the surrounding areas if the Doost operation was to cease operations. Brittain could have testified to

specific security issues that occurred such as thefts, kidnappings, and bombings. Brittain would have testified to the positive influence that the Doost operations provided the specific region of Herat, Afghanistan such as economic and safety stability. Brittain requested to have a conference with OPIC in order to sway them to *not* shut down any of the Doost operations because of the collateral damage that would occur within the immediate area. That meeting, however, never took place.

Brittan flew over the mine and visited the factory numerous times, and provided photographs to Carleen Watts to assist in her investigation. Brittain would have been a credible, influential, and an extremely honest witness in the eyes of the jury as a Colonel in the United States Army. *Mohammed*, 863 F.3d 885 at 890 (counsel may reasonably decline to investigate only "when she or he determines that any potential information an investigation might uncover would have limited value or 'could be easily attacked on cross-examination'"). Brittain would have unquestionably been able to explain the importance of the Doost operation from a military standpoint and based upon information learned from literal troops on the ground, more specifically, that "THE DOOST MARBLE OPERATIONS ARE KEY TO STABILITY IN THIS AREA." (**Exhibit 35**).

Instead, trial counsel relied on Paul Lamoureux, who was left open to being woefully impeached as being biased as a friend, colleague, and potential business partner with Doost and the alleged missing funds. The decision to call Lamoreaux and not Brittain cannot be said to be a strategic decision. Since Lamoreaux was Doost's only witness, who the Government was able to impeach, failing to call Colonel Brittain resulted in prejudice to Doost. *Mohammed*, 863 F.3d at 893 ("due to counsel's inadequacy, the jury had no way to factor in the missing…evidence. We accordingly cannot safely assume that counsel's performance did not affect the verdict").

Further, Brittain would have been able to provide credible evidence of an ongoing large-scale operation, proof that certain equipment was present and accounted for at the Marble Mine and Marble Factory, and that Doost faced insurmountable hurdles operating in Herat, Afghanistan, something that no other defense witness was able to do without impeachment. The failure to call Colonel Brittain was objectively unreasonable, caused prejudice, and was ineffective assistance of counsel. Accordingly, this Court should reverse Doost's convictions and grant a new trial.

### iii. Trial Counsel Failed to Call Thomas Reott

Trial counsel failed to call Thomas Reott, U.S. Counselor Officer at the U.S. Embassy in Madrid, Spain at the Department of State. Reott was Head of the Political Section of the U.S. Consulate in Herat, Afghanistan from July 2011 to July 2012. Reott visited the Marble Mine and Marble Factory numerous times.

Reott would have testified to the "impressive" line of machines present at the factory. Reott would have been able to further testify to the fully-functional Marble Mine and Marble Factory in 2012 and would have testified that the Marble Factory was not subject to the same security threats that the Marble Mine (quarry) was. Reott could have testified that transporting marble from the Marble Mine to the Marble Factory was nearly impossible. Reott also would have testified that Doost and his colleagues were making a legitimate effort to make things work in the face of the security issues that presented themselves. (**Exhibit 36**).

This testimony would have demonstrated to the jury the legitimacy of Doost's operations. Further, Reott was not likely to be impeached as a high-ranking Government official with security clearances. Failure to call Reott was objectively unreasonable and resulted in prejudice to Doost since the jury was not given credible testimony as to the existence and legitimacy of the

Doost operations, the hurdles they faced, and the efforts which were effectuated towards the OPIC loan project.

Reott and Brittain "were unbiased witnesses whose account of what they saw largely corroborated each others'." *Harris v. Reed*, 894 F.2d 871, 878 (7th Cir. 1990) (finding ineffective assistance of counsel when counsel did not "put on any witnesses in support of a viable theory of defense"). Such is the case here, trial counsel did not put on any credible witnesses in support of a viable theory of defense. Testimony from Reott would have greatly aided Doost's case, however, trial counsel did not present his testimony even when Reott was available and ready to testify at the courthouse. As a result, the jury was left to believe the Government's theory of the case as the *only* theory of the case. *Id.* at 879. Accordingly, viewing counsel's performance in totality, Doost received ineffective assistance of counsel which was prejudicial and therefore Doost should be granted a new trial.

**F.     Trial Counsel Failed to Present Evidence That Would Have Absolved Doost of Culpability Under Count XV – False Statement on a Loan Application and Failed to Object to Faulty Jury Instructions.**

Trial counsel's "failure to uncover exculpatory evidence that should have been found, or more generally, his failure to make a thorough investigation, has been found to constitute ineffective assistance." *United States v. Decoster*, 624 F.2d 196, 286 (D.C. Cir. 1976), judgment entered, 598 F.2d 311 (D.C. Cir. 1979).[3]

---

[3] This is mostly unanimous across many circuits. *See*, e. g., *McQueen v. Swenson*, 498 F.2d 207 (8th Cir. 1974); *Garton v. Swenson*, 497 F.2d 1137 (8th Cir. 1974); *Johns v. Perini*, 462 F.2d 1308 (6th Cir.), cert. denied, 409 U.S. 1049, 93 S.Ct. 519, 34 L.Ed.2d 501 (1972); *Pennington v. Beto*, 437 F.2d 1281 (5th Cir. 1971); *Andrews v. United States*, 403 F.2d 341 (9th Cir. 1968); *Coles v. Peyton*, 389 F.2d 224 (4th Cir.), cert. denied, 393 U.S. 849, 89 S.Ct. 80, 21 L.Ed.2d 120 (1968); *Brooks v. Texas*, 381 F.2d 619 (5th Cir. 1967); *Brubaker v. Dickson*, 310 F.2d 30 (9th Cir. 1962), cert. denied, 372 U.S. 978, 83 S.Ct. 1110, 10 L.Ed.2d 143 (1963).

Trial counsel utterly failed to even investigate possible defenses or to uncover the totality of the exchange which formed the basis for Doost's conviction under Count XV. Had trial counsel reviewed discovery documents with any care he would have seen that the false statement in Count XV was in response to a fundamentally ambiguous question. *See* Section I, *supra*. This failure to investigate is just another piece in the puzzle but exemplifies the ineffective assistance Doost received as a whole. Failing to even comb through discovery which contained exculpatory evidence was professionally unreasonable. Further, had counsel proffered the entire alleged false statement, within its natural context, the jury would have seen the fundamentally ambiguous nature of the exchange.

Instead, the jury was shown only one part of the exchange, completely without context, and was allowed to rely solely on the Government's theory without any pushback or contextualization from defense counsel. Without any evidence or argument from defense counsel to contradict or contextualize the Government's theory and partial evidence, Doost was convicted on Count XV. This was prejudicial and ineffective assistance of counsel. Accordingly, this Court should reverse Doost's convictions and grant a new trial.

### G.    Trial Counsel Failed to Object to Faulty Jury Instructions/Verdict Forms.

Trial counsel also failed to object to a faulty jury instruction, even after warning from the Court that "the proposed verdict form doesn't provide sort of the clarity as to what the specific allegation is as to a particular count. So, for example, the false statements counts -- I don't remember what they are. The verdict sheet simply just references the count number but doesn't actually reference the particular false statement."

Trial counsel never adequately addressed this problem and the jury could not have known which particular false statement coincided with which particular count. This was particularly

important in light of the multiplicitous charges; two false statements within the same document. *See* Section III(C), *infra*. The failure to object to the jury instruction, after the Court's notice, was objectively unreasonable. Further, the jury instruction was prejudicial since the jury was likely unable to make a full and accurate assessment of which particular false statement coincided with a particular count and, more precisely, which false statement within the same document the jury was convicting Doost on. Accordingly, Doost received ineffective assistance of counsel and this Court should reverse Doost's convictions and grant a new trial.

## III. The Indictment was Defective and Should Be Dismissed.

### A. This Court Could Should Hear Defective Indictment Claims Because Though Untimely, there is "Good Cause".

A defendant generally must move to dismiss an indictment on limitation grounds before trial, otherwise their request is untimely. FED. R. CRIM. P. 12(b)(3)(B). Thereafter, "the party seeking relief must show 'good cause' for failure to raise a claim by the deadline, *a flexible standard* that requires consideration of all interests in the particular case." *Id.,* FED. R. CRIM. P. 12(b) (advisory committee note to 2014 amendments) (emphasis added); *United States v. Abu Khatallah*, 316 F. Supp. 3d 207, 211 (D.D.C. 2018). Ineffective assistance of counsel may be "good cause" for such otherwise untimely motions. *United States v. Weathers*, 186 F.3d 948, 958–59 (D.C.Cir.1999) (remanding for hearing); *United States v. Cameron*, 729 F. Supp. 2d 418, 421 (D. Me. 2010), aff'd, 699 F.3d 621 (1st Cir. 2012) (ineffective counsel is grounds for "good cause"); *United States v. Hall*, 565 F.2d 917, 920 (5th Cir. 1978) (avoiding the penalization of a criminal defendant for the inadvertence of his attorney constitutes "good cause"); *United States v. Bankston*, 820 F.3d 215, 228 (6th Cir. 2016) (in an ineffective assistance of counsel claim, Rule 12 would "work injustice, since the failure to raise a defective indictment claim in a pre-trial motion may result in a waiver of that claim) (internal quotations omitted); *Joseph v. Coyle*,

469 F.3d 441, 459 (6th Cir. 2006) (ineffective assistance of counsel for the purpose of establishing cause was met in habeas petition).

There is an abundance of Sixth Amendment interests at stake, worthy of this Court's consideration. For one, Doost's trial counsel utterly failed to object to several counts in the indictment that squarely fell outside the statute of limitations. Under the *flexible* standard enumerated in Rule 12, had trial counsel objected to at least some of the counts in the indictment, those counts would have been dismissed with prejudice. This deprivation of a Sixth Amendment right should not lead the way to further penalizing Doost in barring him from making objections to the statute of limitations, even post-trial. *United States v. Gonzalez*, 81 F. Supp. 3d 1212, 1223 (D.N.M. 2015) ("good cause" "does *not* require a district court to consider the prejudice that accepting an untimely motion may cause the United States") (emphasis added). The forefront of the Sixth Amendment is that "technical requirements should not be allowed to prevail over constitutional rights." *Id.* at 1225.

Supposing that the Government argues that this is an attempt at "sandbagging," this is not the case. For good reason, Doost's trial counsel is no longer representing Doost and there could not have been any reasonable "tactical decision" to forego challenging the statute of limitations, and the multiplicitous indictment. *United States v. Bankston*, 820 F.3d 215, 234 (6th Cir. 2016) (finding prejudice because had counsel objected, the particular count would have been dismissed). Instead, this is an actual case of inadvertence which resulted in ineffective assistance of counsel. There is no reasonable "tactical decision" that could have motivated trial counsel from not objecting to the statute of limitations. *United States v. Palomba*, 31 F.3d 1456, 1466 (9th Cir. 1994). Thus, had trial counsel moved to dismiss the counts brought outside of the statute of limitations, there is a reasonable probability that the counts would have been dismissed

and the jury would have been privy to fewer—and a less prejudicial amount of—counts charged in the indictment. *United States v. Weathers*, 493 F.3d 229, 238 (D.C. Cir. 2007).

### B. The Indictment Was Multiplicitous and Prejudicial in Charging Doost with Three Counts of Major Fraud Under 18 U.S.C. 1031.

Doost's indictment was multiplicitous and prejudicial as the indictment essentially charged each act in furtherance of the alleged scheme rather than charging one count for the entire alleged scheme. Under 18 U.S.C. § 1031(a), only "executions" of the alleged fraudulent scheme are chargeable, thus, "not every act in furtherance of a fraudulent scheme is a separate 'execution' of the scheme." *United States v. Sain*, 141 F.3d 463, 473 (3d Cir. 1998).

To determine whether a particular action is a separate execution of a fraudulent scheme, courts look to whether the actions are "substantively and chronologically independent from the overall scheme." *Id*. However, movement of one sum of money, in several separate stages, only constitutes one "execution." *United States v. Bruce*, 89 F.3d 886, 889 (D.C. Cir. 1996) *citing United States v. Lemons,* 941 F.2d 309, 318 (5th Cir.1991); *see also Sain*, 141 F.3d at 473 (indictment not multiplicitous because transactions were substantively independent executions since there was no evidence defendants sought a specific amount of money, rather, they intended to and continued to pursue false claims as to garner as much money as possible). Further, "execute" does not encompass any acts taken in furtherance of a scheme to defraud, rather, the statute punishes "the set of acts that are necessary to *complete* or *fulfill the purpose* of a scheme to defraud." *United States v. Wiehl*, 904 F. Supp. 81, 87 (N.D.N.Y. 1995) (emphasis added).

An examination of the facts of each particular case is appropriate to determine what constitutes an execution of a scheme, *United States v. Lilly,* 983 F.2d 300, 303–04 (1st Cir.1992), and "[d]oubt should be resolved *against* turning a single transaction into a multiple offenses. *Fisher v. United States*, 231 F.2d 99, 103 (9th Cir. 1956) (emphasis added).

Here, Doost was charged with three counts of major fraud under 18 U.S.C. § 1031(a), which definitively track the three disbursement requests, not the overarching loan itself. However, Doost's loan was executed by a single entity, ECM, borrowing from a single entity, OPIC, and for a pre-determined amount of money, $15.8 million. The fact that the $15.8 million was disbursed in three allotments does *not* mean that there were three separate executions of the scheme. *Bruce*, 89 F.3d at 889; *Wiehl*, 904 F. Supp. 81 at 89. Further, Doost signed a loan agreement for the $15.8 million loan to fund a single project—the Marble Mine. *United States v. Heath*, 970 F.2d 1397, 1402 (5th Cir. 1992) (holding two separate loans from a single bank as a single execution of a scheme since the two loans were "integrally related"); *Lilly*, 983 F.2d at 304 (finding a single execution of a scheme where defendant obtained a loan from a single bank, proffered a single package of documents that misstated a single material fact, in order to obtain a single loan, funded by one singular real estate purchase). Thus, once approved for the preconceived $15.8 million loan and the singular loan agreement was signed (Exhibit 14), the alleged scheme was executed. *United States v. Brandon*, 17 F.3d 409 (1st Cir.1994) (finding the scheme was not multiplicitous since it was designed to obtain a set amount or preconceived sum of money, rather, the scheme was intended to procure as many fraudulent loans as possible through separate loan applications; 176 separate loans to 79 different buyers).

The three loan disbursements were merely movements of money and all "integrally related" since they all flowed from the same loan application, from the same entity, to fund the same project, for one preconceived sum of money – $15.8 million. *Wiehl*, 904 F. Supp. 81 at 90 (finding that focusing on the number of disbursements "as opposed to the execution of the contract for example, the government is able to manipulate the number of counts and subject

defendants to the maximum penalty," thus, the several submissions was a single execution within the meaning of the major fraud statute).

Indeed, the Government's indictment supports the view that there was only one execution of the alleged scheme to defraud, "[i]t was the *purpose* of the scheme and artifice for the defendant and his associates to unlawfully enrich themselves by *applying for and obtaining a loan from OPIC . . .,*" (R. 1, p. 7, para. 3) (emphasis added), not applying for three distinct loans. *Wiehl*, 904 F. Supp. 81 at 87. This assertion was manifested during trial when Cindy Shepard from OPIC testified that "[t]he *disbursement request is part of the loan agreement*, it's an exhibit to the loan agreement."

In sum, each loan disbursement was interrelated such that each disbursement's only objective was to facilitate the payment of $15.8 million loan, which had already been executed. Any acts alleged to have been taken to carry on the disbursement payments were simply taken in furtherance of the alleged executed scheme. *See United States v. Molinaro*, 11 F.3d 853, 861 (9th Cir. 1993); *Brandon*, 17 F.3d at 409.

Lastly, the Government's multiplicitous indictment, which stretches the most damning counts of major fraud, prejudiced Doost before the jury. In fact, this Circuit specifically holds the following:

> [T]he law protects an individual against multiplicitous indictments to avoid multiple sentences for a single offense and to *eliminate the prejudice which such indictments may generate in the eyes of a jury*. For when an indictment charges numerous offenses arising from the same conduct it "may falsely suggest to a jury that a defendant has committed not one but several crimes." ... Compromise verdicts or assumptions that, with so many charges pending the defendant must be guilty on at least some of them, pose significant threats to the proper functioning of the jury system.
>
> *United States v. Clarridge*, 811 F.Supp. 697, 702 (D.D.C. 1992) (emphasis added, citations omitted) citing *United States v. Phillips*, 962 F. Supp. 200, 202 (D.D.C. 1997).

Accordingly, Doost should be subject to acquittal on Counts I-III of the indictment, or in the alternative, a new trial.

### C. The Indictment Was Multiplicitous and Prejudicial in Charging Doost with Two Counts of Making a False Statement Within the Same Document.

Counts XII and XIII of the indictment wrongfully charged Doost with making two false statements within the same document—the "first disbursement request." However, "[t]he making of a number of false statements to a lending institution in a single document constitutes only one criminal violation." *Mangieri*, 694 F.2d at 1281 quoting *United States v. Sue*, 586 F.2d 70, 71 (8th Cir.1978) (per curiam); *United States v. Sahley*, 526 F.2d 913, 918 (5th Cir.1976). This is so because 22 U.S.C. § 2197(n) is not concerned with the particular falsehoods used within the transaction, but with the loan *transaction* itself. *Mangieri*, 694 F.2d 1270 at 1281-82.

Here, the alleged false statements were made within the same document, the first disbursement request, in order to obtain the same loan. *Sahley*, 526 F.2d at 918 (three false assertions, made on one single document, submitted to acquire a single loan was multiplicitous). The alleged false statements are regarding the Gaspari Menotti "project cost" as charged in Count XII, and to the Faudi chainsaw "project cost" as charged in Count XIII. Gov.'s Ex. 100. Both false statements were submitted within the "first disbursement request" under the heading "Project Costs." *Id*. Trial testimony is also consistent with this assertion as for Count XII, "[a]nd [Count] 12 is that the block cutter was a *project cost* for the mine." Tr. Sep. 19, 2018, p. 1218 (emphasis added). As well as for Count XIII, "Mr. Doost then, on the disbursement request, *the first disbursement request*, on February 15th, 2010, submits those two [Faudi] chainsaws, same two chainsaws for payment from OPIC. OPIC pays for those chainsaws at that time." Tr. Sep. 19, 2018, p. 1199 (emphasis added). These multiplicitous counts were prejudicial, in the eyes of

the jury, and additionally created a risk of more than one sentence for a single offense. *Clarridge*, 811 F.Supp. 697 at 702; *United States v. Jones*, 403 F.3d 604, 606 (8th Cir. 2005) ("[a]n indictment is multiplicitous when it charges a single offense in multiple counts; such an indictment is improper because it can lead to the imposition of multiple punishments for the same crime, violating the double jeopardy clause of the fifth amendment").

Lastly, if false statements are contained in one document it is preferable to only count one for the entire document; this preferred course of action is in response to expressed judicial displeasure on multi-count indictments based on one document. *Fisher v. United States*, 231 F.2d 99, 103 (9th Cir. 1956). As such and as a matter of law, Doost should be subject to acquittal on either Count XII or XIII, or in the alternative, a new trial.

## D. Count I – Major Fraud Against the United States is Barred by the Statute of Limitations.

Notwithstanding the multiplicitous indictment, Doost's indictment was untimely. The statute of limitations for 18 U.S.C. § 1031(a) – Major Fraud Against the United States is seven years. 18 U.S.C § 1031(f). The execution of a Major Fraud "scheme" is not a "continuing offense," thus, the statute begins running when a defendant files their claim with the Government and no longer needs to "engage in any additional conduct to realize the ultimate goal of their scheme." *United States v. Reitmeyer*, 356 F.3d 1313, 1318 (10th Cir. 2004). It is at this point that the financial risk is created and there arises an underlying obligation to be truthful. *Id.* at 1318-19.

The Government returned the indictment on June 7, 2017. (R. 1). The first disbursement request was alleged to have been completed on April 18, 2010. *Id.* This disbursement request was the last document that Doost needed to complete in order to fulfill his "purpose of the scheme and artifice . . . by applying for and obtaining a loan from OPIC . . ." (R. 1, p. 7, para. 3).

As such, the statute of limitations began running on April 18, 2010 and the statute ran on April 18, 2017—50 days before the indictment was returned. Accordingly, Doost should be subject to acquittal on all Major Fraud charges.

### E.    Counts IV-XI – Wire Fraud Counts Are Barred by the Statute of Limitations.

The statute of limitations for 18 U.S.C. § 1343 – Wire Fraud is five years. 18 U.S.C § 3282 (West). Counts IV-VI are alleged to have occurred on April 20, 2010. (R. 1). Counts VII-X are alleged to have occurred on July 21, 2010. Count XI is alleged to have occurred on December 15, 2010. (R. 1). The limitations begins to run when the wire communication has been sent. *See United States v. Garland,* 337 F. Supp. 1, 4 (N.D. Ill. 1971) *citing Fournier v. United States*, 58 F.2d 3 (7th Cir. 1931).

The Government returned the indictment on June 7, 2017. (R. 1). For Counts IV-VI, the statute began running on April 30, 2010 and ran until April 30, 2015. For Counts VII-X, the statute began running on July 21, 2010 and ran until July 21, 2015. For Count XI, the statute began running on December 15, 2010 and ran until December 15, 2015. Accordingly, all of the above counts were alleged to have occurred outside the statute of limitations since the indictment was returned more than five years after each alleged wire transfer occurred. As such, Doost should be subject to acquittal on Counts IV – XI.

### F.    Counts XII-XIII – False Statement on Loan Application or Extension Counts Are Barred by the Statute of Limitations.

The statute of limitations for 22 U.S.C. § 2197(n) is five years. Counts XII – XIII were alleged to have been made "[b]etween on or about April 18, 2010 and April 30, 2010." (R. 1).

The Government returned the indictment on June 7, 2017. (R. 1). The statute of limitations began running, at the very latest, on April 30, 2010. The statute ran until April 30,

2015. Thus, the statute of limitations for Counts XII and XIII are barred. As such, Doost should be subject to acquittal on Counts XII and XIII.

**G.     Counts XIV and XV – False Statement on Loan Application or Extension Counts Are Barred by the Statute of Limitations.**

The statute of limitations for 22 U.S.C. § 2197(n) is five years. Count XIV was alleged to have been made on July 15, 2010 and Count XV was alleged to have been made on December 13, 2010. (R. 1).

The Government returned the indictment on June 7, 2017. (R. 1). The statute of limitations for Count XIV began running on July 15, 2010; for Count XV the statute of limitations began running on December 13, 2010. The statutes ran until July 15, 2015 and December 13, 2015, respectively. Because the indictment was returned more than 5 years after the alleged false statements, the indictment was untimely. Thus, Doost should be subject to acquittal on Counts XIV and XV.

**H.     Counts XVI-XXIII – Money Laundering Counts Are Barred by the Statute of Limitations.**

The statute of limitations for 18 U.S.C. §§ 1956(a)(1)(B)(i) and (2) is five years. Count XVI is alleged to have occurred between May 2, 2010 through May 6, 2010; Count XVII is alleged to have occurred on May 5, 2010; Count XVIII is alleged to have occurred on July 22, 2010; Count XVIIII is alleged to have occurred on July 24, 2010; and Count XX is alleged to have occurred on July 27, 2010.

The Government returned the indictment on June 7, 2017. (R. 1). For Count XVI, the statute of limitations ran, at the latest, on May 6, 2015; Count XVII on May 5, 2015; Count XVIII on July 22, 2015; Count XVIIII on July 24, 2015; and Count XX on July 27, 2015.

Because the indictment was returned later than five years after each alleged Money Laundering

count, Doost should be subject to acquittal on Counts XVI through XX.

**IV.    The Admission of the Foreign Business Documents Was in Error Because the
Documents Were Procured from an Untrustworthy Source.**

The admission of *any* foreign documents from Gaspari Menotti was in error since

Gaspari Menotti allegedly generated documents for Doost, not in accordance with regularly

conducted business activity. Gaspari Menotti's repeated generation of invoices, allegedly at

Doost's request, shows that it is an inherently untrustworthy source. Further, Gaspari Menotti

had a motive to fabricate its dealings with Doost as to brush off any culpability and as additional

retaliation against Doost since ECM has a large outstanding balance with Gaspari Menotti.

Generally, foreign business documents are inadmissible if "the source of information or

the method or circumstances of preparation indicate lack of trustworthiness." 18 U.S.C § 3505.

Additionally, business documents prepared for "something other than a regular business

purpose," do not fall within the business records exception. *United States v. Lemire*, 720 F.2d

1327, 1350–51 (D.C. Cir. 1983). Likewise, documents drafted in response to "unusual or

'isolated' events, particularly where the entrant may have a motive to be less than accurate," are

also inadmissible. *United States v. Strother*, 49 F.3d 869, 876 (2d Cir. 1995). This comports with

"the principal precondition to admission of documents as business records" that the records must

show "sufficient indicia of trustworthiness to be considered reliable." *Saks Int'l, Inc. v. M/V Exp.

Champion*, 817 F.2d 1011, 1013 (2d Cir. 1987); *Mississippi River Grain Elevator, Inc. v. Bartlett

& Co*., Grain, 659 F.2d 1314, 1319 (5th Cir. 1981).

Here, Gaspari Menotti cannot be considered a trustworthy source. Gaspari Menotti is

alleged to have generated invoices at Doost's request, "DOOST asked Gaspari Menotti to send

AGF (Afghan Growth Finance) a copy of Proforma Invoice 0349-09/B and to provide a letter

stating [Doost] had already paid for the line of machines purchased from Gaspari Menotti. Gaspari Menotti provided both items to AGF." (**Exhibit 37**). Additionally, Gaspari Menotti allegedly provided inflated invoices "[t]o accommodate A. Doost's request . . . . [and] created Proforma Invoice 0349-09/B which included the exact same list of machines and prices but with a readjusted discount indicating an overall cost of €1.635.000." (**Exhibit 37**). Documents that are purportedly false and generated at a client's request cannot be said to be a part of a regularly conducted business activity. The documents were generated in response to "isolated" and "unusual" events not within the course of regularly conducted business activity. To further this point is the fact that Simone had every reason in the world to both exhibit bias and to fabricate documents since "[Doost's] failure to pay Gaspari Menotti also cost Simone his commission on the deal and personal funds he spent for travel to and from Afghanistan." The Government is the proponent of these assertions at trial:

> And so that generated from Mr. Doost a request to Mr. Dazzi and Mr. Simone, can you produce an invoice for me for 477,000 euro? Mr. Dazzi then sends back to Mr. -- I'm sorry. Mr. Simone sends an invoice back to Mr. Doost with the date of March 1st of 2010, and the amount of $630,000 . . . Now, you know that's all phony. That's just not a real document. It's a real piece of paper, but what it shows is false.

> Tr. Sep. 19, 2018, p. 1204.

In sum, the documents that were admitted were *not* kept within the normal course of regularly conducted business activity. The source of the documents, Gaspari Menotti, was not only biased but has been alleged to have generated documents at Doost's request. If one set of "phony" documents cannot be relied upon, then the source has been tainted and further documents produced from Gaspari Menotti cannot be plausibly relied upon as trustworthy. These circumstances are the prototypical indicia of untrustworthiness as to make the documents unreliable and subsequently inadmissible. *United States v. Khatallah*, 278 F. Supp. 3d 1, 8

(D.D.C. 2017) *relying on* 18 U.S.C. § 3505(a)(1) ("intentional fabrication or manipulation of the records" is indicia of untrustworthiness) Accordingly, it was error to have these documents admitted and therefore this Court should grant Doost a new trial.

**CONCLUSION**

For the reasons set forth above and looking to the totality of the evidence presented (and not presented), Doost should be subject to acquittal on all counts, or in the alternative, a new trial.

Dated: February 21, 2019              Respectfully Submitted,

                                     /s/ Glenn Seiden
                                     Glenn Seiden, *pro hac vice*
                                     SEIDEN NETZKY LAW GROUP, LLC
                                     333 South Wabash Avenue, Suite 2700
                                     Chicago, Illinois 60604
                                     312.236.3060
                                     Illinois Bar ID 2543761
                                     gseiden@snlgllc.com
                                     bstevens@snlgllc.com

                                     /s/ Andrew M. Friedman
                                     Andrew M. Friedman
                                     Shulman, Rogers, Gandal, Pordy & Ecker, P.A.
                                     12505 Park Potomac Avenue, 6th Floor
                                     Potomac, MD 20854
                                     301.231.0942
                                     Bar ID 462131
                                     afriedman@shulmanrogers.com

**CERTIFICATE OF SERVICE**

I, Glenn Seiden, an attorney, do hereby certify under penalties of law that, in accordance with Fed.R.Civ.P.5 and the General Order on Electronic Case Filing (ECF), I caused a copy of the **DEFENDANT DOOST'S COMBINED RULE 29 AND 33 MOTION** to be served upon the all the named attorneys of record by CM/ECF filing methods on this the 21st day of February, 2019.

/s/ Glenn Seiden
Glenn Seiden