**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )     **Criminal No. 1:17-CR-00109 (APM)** |
| | ) |
| **AZAM DOOST,** | ) |
| | ) |
| **Defendant.** | ) |

_____)

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S COMBINED RULE 29 AND 33 MOTION, ECF #105

The United States, by and through its undersigned counsel, hereby submits this opposition to the combined motion of defendant Azam Doost (hereinafter "defendant") under Fed. R. Crim. P. 29 and 33. ECF #105. Following trial in this matter, defendant was convicted on counts 1-20 of the indictment, and acquitted on counts 21-23. The counts of conviction charge defendant with defrauding the Overseas Private Investment Corporation ("OPIC"), a U.S. government agency, with regard to a $15.8 million loan that OPIC made to assist in the reconstruction of Afghanistan, a loan for which defendant paid none of the principal and only that interest he needed to pay to continue to obtain disbursement of funds under the loan. In obtaining the disbursement of the loan proceeds, defendant submitted fraudulent documents to OPIC, and upon receiving the loan proceeds, defendant laundered the money to hide its location and ownership.

Defendant moves, pursuant to Fed. R. Crim. P. 29 for judgment of acquittal notwithstanding the jury's guilty verdict, as to count 15 of the indictment. For the reasons set forth below, this motion should be denied. Viewing the evidence presented at trial in the light most favorable to the government, a reasonable finder of fact clearly could have found defendant guilty

of count 15.

Defendant also asks the Court to grant him a new trial pursuant to Fed. R. Crim. P. 33 claiming that his trial defense counsel was ineffective before and during trial. During trial, he claims his counsel should have introduced additional evidence, called additional witnesses, objected to the admission of evidence by the government, and challenged portions of the indictment and the jury instructions. Before trial, defendant claims that his counsel was ineffective for his failure to challenge portions of the indictment. For the reasons set forth below, this motion should also be denied. Defendant's claims are general and conclusory, and do not meet the threshold showing of ineffectiveness set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), under which defendant must show that his counsel's performance was deficient and that the alleged deficient performance prejudiced him.

Accordingly, the United States respectfully submits that the Court should deny defendant's request for judgment of acquittal on count 15 and for a new trial.

## I.   Procedural and Factual Background

### A.  Procedural History

On June 7, 2017, a grand jury returned a 23-count indictment against defendant charging him with three counts of major fraud against the United States, in violation of 18 U.S.C. § 1031(a), eight counts of wire fraud, in violation of 18 U.S.C. § 1343, two counts of making a false statement on a loan application or extension, in violation of 22 U.S.C. § 2197(n) and 18 U.S.C. § 2, two counts of making a false statement on a loan application or extension, in violation of 22 U.S.C. §2197(n), and eight counts of money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 2.  ECF #1. As stated above, these charges arise from defendant's scheme to defraud OPIC, a U.S. government agency, with regard to this $15,800,000 loan.

Trial in this matter began on September 10, 2018. The government provides the following chart of substantive trial events to aid the Court in locating evidence and testimony within the record of trial.

| Date | Session | Testimony | Begin Page | End Page |
|------|---------|-----------|------------|----------|
| 9/10/2018 | P.M. | Government's Opening Statement | 257 | 268 |
| | P.M. | Defendant's Opening Statement | 268 | 279 |
| 9/11/2018 | A.M. | Cindy Shepard, Direct, OPIC | 319 | 412 |
| | P.M. | Cindy Shepard, Direct | 445 | 452 |
| | P.M. | Cindy Shepard, Cross | 452 | 482 |
| | P.M. | Cindy Shepard, Redirect | 482 | 490 |
| | P.M. | Marco Turrio Baldassarri, Fantini | 497 (video) | 499 |
| 9/12/2018 | A.M. | Quinton Collier, Direct, ARFC & DAI | 531 | 583 |
| | A.M. | Quinton Collier, Cross | 584 | 605 |
| | A.M. | Quinton Collier, Redirect | 606 | 611 |
| | A.M. | Marco Turrio Baldassarri | 612 | 613 |
| | A.M. | Paolo Corsini, Gaspari Menotti | 615 (video) | 615 |
| | P.M. | Paolo Corsini | 643 | 647 |
| 9/13/2018 | A.M. | Mauro Dazzi, Gaspari Menotti | 662 (video) | 662 |
| | A.M. | Jeffrey Constantz, Direct, OPIC | 663 | 676 |
| | | Jeffrey Constantz, Cross | 676 | 717 |
| | | Jeffrey Constantz, Redirect | 717 | 726 |
| | A.M. | Donald Lubreski, Direct, AGF | 727 | 733 |
| | | Donald Lubreski, Cross | 734 | 735 |
| | A.M. | Special Agent Carleen Watts, Direct | 736 | 777 |
| | P.M. | Special Agent Carleen Watts, Direct | 811 | 894 |
| | P.M. | Special Agent Carleen Watts, Cross | 894 | 921 |
| 9/14/2018 | P.M. | Special Agent Carleen Watts, Cross | 959 | 974 |
| | P.M. | Special Agent Carleen Watts, Redirect | 974 | 994 |
| | P.M. | Government rest, Defense Rule 29 motion denied | 1019 | 1022 |
| 9/18/2018 | A.M. | Paul Lamoureux, Direct | 1023 | 1039 |
| | A.M. | Paul Lamoureux, Cross | 1039 | 1074 |
| | A.M. | Paul Lamoureux, Redirect | 1075 | 1085 |
| | P.M. | *Boyd* inquiry, Defense renewed Rule 29 motion denied, Defense rest | 1087 | 1093 |
| 9/19/2018 | N/A | Government Closing Argument | 1184 | 1221 |
| | | Defense Closing Argument | 1222 | 1259 |
| | | Government Rebuttal Argument | 1260 | 1277 |
| 9/21/2018 | A.M. | Jury note and instruction | 1331 | 1341 |
| 9/21/2018 | P.M. | Jury note and instruction | 1352 | 1361 |
| 9/24/2018 | N/A | Verdict | 1371 | 1375 |

On September 24, 2018, the jury returned verdicts that defendant was guilty of counts 1-20 and not guilty of counts 21-23 (the last three money laundering counts). ECF #53.

On November 5, 2018, with permission of the Court, trial counsel for defendant withdrew from this case, and new defense counsel entered the case. Minute Order 11/5/2018. On January 28, 2019, the Court Ordered that defendant's post-trial motions were to be filed on or before February 21, 2019. On February 21, 2019, defendant filed the present motion. ECF #105.

## B. Factual Background[1]

Defendant and his brother co-owned a company known as Equity Capital Group, LLC ("ECG") located in Dubai, United Arab Emirates ("UAE"). In or about 2006, one of ECG's subsidiaries, Equity Capital Mining, LLC ("ECM"), obtained a 10-year lease at the White Dove Marble Mine located in Cheshti-i-Sharif, Afghanistan (approximately 120 km east of Herat) (the "Marble Mine") from the Afghanistan Minister of Mining and began extracting marble for export. Around the same time, defendant began construction of the Cheshti-i-Sharif Marble Factory ("the Marble Factory") in Herat to process marble extracted from the Marble Mine. The factory opened in May of 2011.

On or about February 19, 2010, defendant executed a loan agreement with OPIC whereby OPIC agreed to provide up to $15,800,000 to ECM for the development, maintenance, and operation of the Marble Mine. Defendant was personally responsible for a matching amount of money. The loan agreement required quarterly reports from ECM, "setting forth in reasonable detail all transactions between the borrower [ECM], on the one hand, and a Shareholder [(defendant and his brother)] or any Affiliate of a Shareholder, on the other hand[.]" An "Affiliate"

---

[1] The facts stated here are consistent with those in The Offense Conduct recited in the PSR, at 5-12, ¶¶ 6-44.

was defined in the loan agreement, in relevant part, as "with respect to any Person, (i) any other Person that is directly or indirectly controlled by, under common control with, or controlling such Person; . . . (iii) any officer or director of such Person; or (iv) any spouse or relative of such Person."  In relevant part, "Person" was defined in the loan agreement as "an individual, a legal entity, including a partnership, a joint venture, a corporation, a trust, and an unincorporated organization[.]"  The loan agreement further required defendant to submit purchase invoices to document ECM's expenses for the Marble Mine that would be paid for with proceeds from the loan.

Over the eight month period following approval of the OPIC loan, defendant and his business consultant ("Consultant") submitted to OPIC, via email or in person, three requests to disburse loan funds on or about the following dates: April 18, 2010, for $7,000,000; July 15, 2010, for $7,000,000; and November 28, 2010, for $1,800,000.  Defendant and the Consultant attached alleged invoices from various vendors of equipment for the Marble Mine to each disbursement request.

At trial, the government proved that defendant defrauded OPIC in two main ways:  (1) by failing to disclose a number of affiliated transactions, as required by the loan agreement; and (2) by submitting false and/or fraudulent purchase invoices purporting to document expenses for the Marble Mine.  Indeed, a number of the invoices that defendant submitted or caused to be submitted through the Consultant were demonstrably false and/or fraudulent and others had indicia of fraud, such as sequentially numbered invoices with the same date, and almost no detail of what item was allegedly purchased from the alleged vendor, such as serial or VIN numbers.  Moreover, defendant unquestionably owned and/or controlled a number of the vendors from which he purportedly incurred expenses for the Marble Mine, and failed to disclose this self-dealing to OPIC

as required by the loan agreement. Furthermore, the vendors that defendant owned and/or controlled and from which he allegedly bought equipment were shell companies with no demonstrable sales.

OPIC issued the requested funds directly to the vendors in reliance on the invoices and banking information that defendant provided. Despite the requirements of the loan agreement, defendant made no principal payments on the loan. As a result, the loan went into default with a principal balance of approximately $15,800,000 and past due interest of approximately $1,913,788.99.

In addition to OPIC, defendant sought, and in some cases obtained, funding from three U.S. government-funded (through the United States Agency for International Development) non-governmental organizations ("NGOs") to develop the Marble Mine and the Marble Factory. The NGOs are based in the Washington, D.C. area, and during the relevant time period, ran loan and grant programs for small and medium businesses in Afghanistan.

The NGOs were: (1) ACDI/VOCA, through its Afghan Rural Finance Center ("ARFC") loan program; (2) DAI, through its Afghan Small and Medium Enterprise Development ("ASMED") grant program; and (3) SEAF, through its Afghan Growth Finance ("AGF") loan program.

At trial, the government presented evidence that defendant engaged in a scheme to defraud the NGOs that was related, and similar, to the OPIC scheme by making false representations and submitting false invoices in order to obtain loan and grant money and failing to disclose self-dealing. Defendant even used a number of the same false invoices to defraud, or attempt to defraud, the NGOs as he used to defraud OPIC. The government's Notice and Motion in Limine Pursuant to Fed. R. Evid. 404(b), ECF #40, set forth the facts of these separate fraud schemes in

more detail, and the legal basis for the admissibility of this evidence. The Court found the facts as set forth in the government's motion met the standard under Fed. R. Evid. 404(b) and thus were admissible at trial. Dkt. Entry 8/27/2018.

## II.   Argument

### A.  Defendant is not entitled to set aside the jury's guilty verdict on count 15

Defendant moves, pursuant to Fed. R. Crim. P. 29, for a judgment of acquittal notwithstanding the jury's guilty verdict on count 15. ECF #105 at 6-14. That count charged a false statement to OPIC. The question under Rule 29 for the Court is whether "viewing the evidence in the light most favorable to the government, according the government the benefit of all legitimate inferences, and recognizing that it is the jury's province to determine credibility and to weigh the evidence, a reasonable jury *must necessarily* entertain a reasonable doubt on the evidence presented." *United States v. Singelton*, 702 F.2d 1159, 1163 (D.C. Cir. 1983) (emphasis in original) (reversing trial judge's grant of an acquittal post jury verdict and directing trial court to reinstate the jury's verdicts of guilty).

In his motion, defendant claims "that the prosecution has failed to present sufficient proof from which any rational juror could conclude beyond a reasonable doubt that [defendant] is guilty of count 15." ECF #105 at 6. He claims that the context of the alleged false statement was fundamentally ambiguous and the statement was taken out of context. *Id.*[2] Viewing the evidence in the light most favorable to the government, including the Court's instructions to the jury, however, the evidence is clearly sufficient to support the jury's verdict on this count.

Counts 14 and 15 charge false statements to OPIC on defendant's representations for the

---

[2]  Defendant repeats these arguments in his claim of ineffective assistance of counsel discussed below. The government's response is located in section II.B.iv of this brief.

respective periods that there were no affiliate transactions.  The loan agreement defined affiliate transactions and the requirement of defendant to report those for the respective period.  *See, e.g.*, Exhibit 39 at Section 6.06(d) ("Borrower shall furnish to OPIC . . . [w]ithin forty-five (45) days after the end of each fiscal quarter, a report, Certified by an Authorized Officer of the Borrower, setting forth in reasonable detail all transactions between the Borrower . . . and . . . any Affiliate"); *id.* at Schedule X, 1. Defined Terms, "Affiliate" (definition of term "Affiliate").  These documents were presented to the jury and explained in the testimony of Cindy Shepard of OPIC.  Ms. Shepard discussed and described the loan agreement, *see, e.g.,* Trial Transcript, 9/11/2018, a.m. session, at 353 (the affiliate reporting requirement); *id.* at 361 (defendant signed the loan agreement); *id.* at 362 (the definition of affiliate); *id.* at 362-63.

Ms. Shepard also testified about the relevant documents during the disbursement process, including the second disbursement request that came in June 2010 (Exhibit 200).  *Id.* at 389.  The request was signed by defendant, *id.* at 389-90, and had a certificate by defendant, under Section 6.06(d) of the loan agreement, that "[f]or the financial quarters ending March 31st and June 30th, there were no affiliate transactions that occurred."  *Id.* at 391-92.  This is the false statement alleged in count 14 and set forth in the Court's jury instructions.  ECF #58 at 20.

Moreover, Ms. Shepard testified about the third disbursement request that came into OPIC in November 2010 signed by defendant (Exhibit 300).  Trial Transcript, 9/11/2018, a.m. session, at 406.  She identified an email from defendant to OPIC at that time (Exhibit 301) in which defendant stated there were no affiliate transactions that occurred during the quarter ending September 30, 2010.  *Id.* at 407.  She testified that, with small borrowers like defendant, OPIC would accept emails sometimes instead of the typed certificate.  *Id.*  She also testified that that, under the loan agreement, if there had been payments to an unreported affiliate that that would

have been a violation or breach of the loan agreement and that OPIC was not aware of any affiliation of defendant with any of the relevant companies to which it sent payments under the disbursement request. *Id.* at 445-46.

Further, the Court's jury instructions made it clear to the jury that to find defendant guilty on count 15, or the three other counts preceding it, that the government had to prove beyond a reasonable doubt that defendant made a false statement or report to OPIC, that defendant knew the statement was false, *i.e.*, "untrue when made and the person making it knows it is untrue," and that defendant did so with the intent to influence an action by OPIC with respect to a loan. ECF #58 at 19-20. In the jury instructions, the Court set forth that defendant's alleged false statement for count 15 was "[t]hat there were no affiliate transactions that occurred during the quarter ending September 30, 2010." *Id.* at 20. When the jury found defendant guilty on count 15, it had already considered and found defendant guilty on the three preceding false statement to OPIC counts, including count 14 which charged defendant's false statements about there being no affiliate transactions in the two preceding quarters. *Id.*; ECF #54 at 3-4 (Verdict Form); ECF #49 (Jury Note, jury still considering, among others, count 15). Accordingly, the jurors had already considered the evidence as to whether statements by defendant to OPIC were false and knowingly made, including as to affiliate transactions, other than as to count 15.

Under the applicable standard for Rule 29, there clearly was sufficient evidence to support the jury's verdict on count 15. Despite defendant's arguments to the contrary, the context and definition of the term "Affiliate" were clear. The email from John Aldonas of OPIC, which defendant references, does not negate that, but rather emphasizes that defendant understood the certification he was providing to OPIC. ECF #105 at 9 ("whatever affiliated transactions have taken place in the accounting period, and that they have taken place on an arms-length basis[.] . .

. I would ask that you carefully read the definition of Affiliated Transactions so you can consider what if any types of transactions might fit the reportable category" for the quarter ending September 30, 2010.")

Defendant also tries to extrapolate from one or more misspellings in defendant's emails to draw a conclusion that he "exhibits a weak proficiency in the English language." To the contrary, despite occasional misspellings in defendant's emails, e.g., "accurred" (and even Aldonas had the misspelling "Septbmer" in his email), the jury had before it a voluminous amount of emails from which it could draw its own conclusions about defendant's proficiency in English, which proficiency was consistently strong. This was true for his communications with OPIC, as well as the business people in Italy with whom he communicated in English. *See, e.g.,* Exhibits 9-12, 26-29, 35-36 (emails between Gaspari Menotti representatives and defendant); Exhibits 23-24 (emails from Fantini representative to defendant). Because the evidence was sufficient under the Rule 29 standard, defendant's motion should be denied.

### B. The record in this case does not support defendant's claim he received ineffective assistance of counsel

Defendant also moves, pursuant to Fed. R. Crim. P. 33, for a new trial, claiming he received ineffective assistance of counsel. ECF #105 at 14-30. He raises a number of alleged grounds for his claim. *Id.* As will be discussed below, none of these claims, individually or collectively, are well founded based on the record in this case.

The Court may grant a defendant's motion for a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). "While the determination as to whether a new trial would be in the interest of justice is left to the Court's sound discretion, the Court should not set aside the verdict simply because it feels that some other result would be more reasonable. Even when error occurs, a new trial should be granted only if the moving party has shown that the error was

substantial, not harmless, and that the error affected the Defendant's substantial rights." *United States v. Walker*, 899 F. Supp. 14, 15 (D.D.C. 1995).

A defense counsel raising a claim of ineffective assistance of counsel must present factual allegations that, if true, would establish a violation of his Sixth Amendment right to counsel. To establish such a violation, the defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *United States v. Sitzmann*, 893 F.3d 811, 831 (D.C. Cir. 2018). Further, "[e]ach of these elements is substantial. Deficient performance requires errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment, which means that counsel's representation fell below an objective standard of reasonableness. . . . Prejudice means that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Sitzmann*, 893 F.3d at 831 (internal quotation marks and citations omitted). A court can reject ineffective assistance of counsel claims "where the record clearly shows that the challenged attorneys' actions were not deficient, . . .where the record clearly shows that the defendant was not prejudiced, . . . and where the ineffective-assistance allegations are presented in such vague and conclusory fashion that they do not raise any colorable claim of error or prejudice." *Id.* at 831-32 (internal quotation marks and citations omitted).

In this case, defendant's claims should be rejected because the record shows that defense trial counsel's actions were not deficient, did not result in prejudice, and/or his claims now are too vague and conclusory to warrant new trial. Accordingly, his motion should be denied.

In addition, as the Court knows and saw, the two defense lawyers who tried this case are capable and effective advocates who vigorously and well represented defendant before and during the trial. *See, e.g.*, Trial Transcript, 9/19/2018, at 1285-86 (the Court, following closing arguments,

said that "I think, however this turns out, both sides should be – should be proud of the work that's been accomplished. The presentations were excellent, and I think you've given the jury quite a bit to think about. So congratulations on being through the end of the trial."). Defendant's individual claims regarding ineffectiveness are addressed below.[3]

> i. Defendant has shown neither deficiency nor prejudice in his trial counsel's failure to introduce evidence

Defendant contends that defense trial counsel failed to introduce evidence showing that he used the OPIC loan proceeds to purchase equipment for the Marble Mine which, in his view, would have refuted the government's theory of the case. ECF #105 at 15-17. He asks the Court to grant a new trial on this basis. The government's theory, however, was never that defendant purchased no equipment for the development of the Marble Mine, or that none of the OPIC money went toward equipment purchases. *See, e.g.*, Trial Transcript, 9/18/2018, at 1261 (Government Rebuttal Argument: "And nobody is contesting that he didn't use some of [the OPIC] money to develop the marble industry"). Rather, the government's central theory, set forth in counts 1-3 the indictment, is that defendant submitted false invoices, "falsely claiming that they were for expenses at the Marble Mine," falsely reported to OPIC that he "did not have an affiliation with any companies" from which he purportedly purchased equipment, submitted invoices that had already been paid for by other financing entities, and failed to repay any of the principal, and only a limited amount of interest, on the OPIC loan. ECF #1 at 6-8. The evidence that defendant proffers in his motion

---

[3] Whether or not a defense attorney's representation of a defendant at trial is ineffective depends, in part, on the strength of the government's case. *Strickland* 466 U.S. at 680-81; *United States v. Udo*, 795 F.3d 24, 31 (D.C. Cir. 2015). Here, the government presented substantial evidence of defendant's guilt, which the court acknowledged in quickly denying trial defense counsel's Rule 29 motions. Trial Transcript, 9/18/2018, at 1019-20 (Rule 29 motion); Trial Transcript 9/18/2018, at 1089-90 (Renewed Rule 29 motion). While the government addresses defendant's individual arguments, it would argue that each of its responses to those arguments should be viewed in the context of a strong case in favor of guilt.

would have had no effect on this theory, and may even have been excluded altogether as irrelevant. Thus, it cannot be said that defense trial counsel's failure to introduce them was so constitutionally deficient as to warrant a new trial.

But, even if defense trial counsel's decision not to admit the proffered evidence was somehow deficient, the prejudice to defendant was so minimal that it would not meet the threshold for a new trial set forth in *Strickland* because the evidence (1) does not prove what defendant claims it proves; and (2) would have been cumulative of other evidence already before the jury. *Strickland*, 466 U.S. at 687.

Defendant's allegedly new evidence, discussed below, does not, on its own, prove that equipment listed therein was purchased with OPIC money, or "present and accounted for" at the Marble Mine. ECF #105 at 15. Defense exhibit 10 is simply a list of equipment with no context at all, and defense exhibits 18-19 are simply lists of equipment allegedly received by Green Gate from ECM, apparently as part of its purchase of the mining operation. Trial Transcript, 9/13/2018, a.m. session, at 691. The exhibits do not, however, prove that the listed equipment was purchased from the vendors, and at the prices, listed on the invoices that defendant supplied to OPIC, which was the crux of the government's case.

The accountants that defendant engaged admit as much, writing "[a]s our services were limited in nature, they did not include – physically observing the equipment, matching of serial numbers of the equipment from the purchase orders, [or] tracing the funds from their OPIC or Doost entities bank accounts to the vendors." ECF #105, Exhibit 20 at 1. Importantly, the accountants could not have reconstructed purchases of equipment from the purported vendors, because, as the government's evidence at trial proved, the vendors were shell companies set up by defendant to defraud OPIC. The government presented extensive evidence on this point. For

example, it introduced bank records showing that defendant held a leadership positions, or an interest in, each of the shell companies, and that their operating accounts had few, if any, transactions unrelated to the OPIC loan disbursements. Special Agent Watts identified indicia of fraud, such as sequential numbering, in nearly all of the shell companies' invoices. *See, e.g.*, Trial Transcript, 09/13/2018, p.m. session, at 826. Special Agent Watts also testified about her failed efforts to substantiate the existence of any of the vendors. *See* Trial Transcript, 9/14/2018, at 977 ("Q: "So over the course of this investigation, were you able to identify any evidence that Afghan Stone, Big Five Logistics, and Saheb Zada, the Afghan company were real company?" A: "No."). Marco Turrio Baldassarri testified that Fantini had never sold chainsaws to Afghan Stone, plainly proving that the Afghan Stone invoices admitted as Exhibits 203-206, which defendant supplied to OPIC as part of the second disbursement request, were false. Deposition Testimony, Marco Turrio Baldassarri, RT_R1001_149-18-40_20180724_104640_00001_1_00003.docx, at 00:00:50 (Q: "So is the statement that a Fantini Chainsaw was sold by Afghan Stone, is that a true statement?" A: "No."). The accounting reports that defendant includes as Defense Exhibits 20-22 to his motion do not prove the listed equipment was purchased from the vendors, and at the prices, listed on the invoices that defendant supplied to OPIC, nor could they, because the vendors were fake companies. Accordingly, trial defense counsel's failure to produce them, or introduce them at trial, was not prejudicial.

Similarly, the audit reports that defendant provides as defense exhibits 14-15 merely state that ECM had assets valued at more than $20 million for 2010-2012, but provide no detail about the makeup of the assets, and do nothing to show that defendant purchased the equipment listed in the invoices that he supplied to OPIC.

Further, many of the points that defendant suggests that his counsel should have made

using the alleged new evidence were already made during trial through defendant's witness, cross examination of the government's witnesses, and by defense trial counsel in closing arguments, and the jury still convicted him. For example, defendant's witness, Paul Lamoureux, testified extensively about operations at the Marble Mine and the high quality of marble being produced. *See, e.g.*, Trial Transcript, 9/18/2018, at 1064. On cross examination, Special Agent Watts admitted that she could not say that the OPIC funds were not used to purchase equipment, and that she had "no knowledge of what happened to [the OPIC] money." Trial Transcript, 9/13/2018, p.m. session, at 914. Jeffrey Constantz similarly testified that he could not say that no equipment was purchased for the Marble Mine, and even admitted to visiting the Marble Mine and seeing equipment in operation there. Trial Transcript, 9/13/2018, a.m. session, at 679, 705, 718. Defense trial counsel emphasized Constantz's admission in closing argument: "You heard Jeff Constantz say – the very last question that I asked him: Do you believe that OPIC money helped develop that quarry? And what was his answer? He said yes, it did. Yes." Trial Transcript, 9/19/2018, at 1228. In short, both parties at trial presented evidence that there was equipment in operation at the Marble Mine.

Given the volume of evidence already before it regarding equipment in operation at the Marble Mine, the fact that the jury still found him guilty on nearly all counts shows that it correctly understood the government's case to turn on the falsity in the invoices that he supplied to OPIC, his false representations about no affiliations with vendors, and his failure to repay any of the loan despite having assets to do so, rather than whether any equipment was purchased with OPIC money.

Defendant has thus not met his burden to show deficient performance or prejudice under the *Strickland* standard. The new evidence defendant proffers in his motion would not have

affected the government's theory, and would have been so cumulative of other evidence already before the jury that any prejudice for its exclusion is, at most, minimal. Accordingly, a new trial is not warranted.

ii. <u>The challenged counts were not barred by the applicable statute of limitations</u>

Defendant complains that his trial counsel's decision to not challenge the indictment on statute of limitations grounds was "constitutionally deficient." ECF #105 at 18-19. Defendant makes a similar argument regarding the statute of limitations again in Section III.D-F of his brief. ECF #105 at 36-38. The government's consolidated response to all of defendant's statute of limitations-related arguments is in Section II.C.iii below. Stated in more detail there, the Wartime Suspension of Limitations Act, 18 U.S.C. § 3827 ("WSLA"), clearly applies to the offenses in the indictment, and extends the usual statute of limitations for the offenses so they are within the statutory period. Accordingly, defense counsel's decision to not challenge the indictment on statute of limitations grounds cannot be said to constitute ineffective assistance of counsel.

iii. <u>The challenged counts were not multiplicitous and did not result in prejudice to defendant</u>

Defendant contends his trial counsel was deficient in failing to challenge certain charges as multiplicitous. ECF #105 at 19-20. Specifically, he asserts it was deficient for his counsel not to claim multiplicity in counts 1-3, charging major fraud, and counts 12 and 13, charging false statements by defendant to OPIC. *Id.* Defendant repeats these arguments later in his motion when he claims parts of the indictment were defective. *Id.* at 32-36.[4] Because the counts were not

---

[4] As to the ineffective assistance argument, defendant's proposed remedy is a new trial. *Id.* at 20. As to the defective indictment argument, defendant's proposed remedy is a judgment of acquittal or alternatively a new trial. *Id.* at 35, 36. Otherwise, the arguments in both locations are similar and will primarily be addressed at this time.

multiplicitous and the ways they are charged did not result in undue prejudice to defendant, he has not shown ineffective assistance of counsel, and his request for a new trial should be denied.

Defendant claims counts 1-3 are multiplicitous because they "track the disbursement requests, not the overarching loan itself." *Id.* at 33. He focuses on the total loan amount of $15.8 million, rather than how defendant acquired the money. *Id.* at 34-35. As Ms. Shepard of OPIC testified, however, the loan agreement was more like a line of credit and that any money under that line of credit would be by way of disbursements in each fiscal quarter, no more than five disbursements, and in the amount of not less than $500,000, and not greater than $7 million. Trial Transcript, 9/11/2018, a.m. session, at 354. As the jury heard and saw, defendant then submitted three disbursement requests, in the spring, summer, and fall of 2010, for $7 million, $7 million, and $1.8 million, respectively. Exhibits 100, 200 and 300. That also was made clear in the Court's jury instructions. ECF #58 at 12. The disbursement requests were all part of the same overall plan but were independent criminal acts because each request was for an independent loan transaction. Defendant could have committed any one of the three acts independently and in fact did so. Finally, the intent of the scheme and artifice for counts 1-3 is described in the indictment as "(a) to defraud the United States; and (b) to obtain money and property by means of materially false and fraudulent pretenses, representations and promises." ECF #1 at 6-7. Each disbursement individually fulfilled this intent.

Similarly, defendant claims that counts 12 and 13 charging false statements were multiplicitous because the two "false statements were made within the same document, the first disbursement request, in order to obtain the same loan." ECF #105 at 35. He cites *United States v. Mangieri*, 694 F.2d 1270, 1281 (D.C. Cir. 1982), for the proposition that "the making of a number of false statements to a lending institution in a single document constitutes only one

criminal violation under 18 U.S.C. § 1014." The court in *Mangieri*, which was addressing a defense claim of duplicity, went on to say that while "we do not foreclose the possibility that under some circumstances multiple misrepresentations might justify separate offenses, in this case we find the indictment was not duplicitous." *Id* at 1282. Defendant's argument in this case depends on how loan transaction is defined, e.g., whether the full $15.8 million was available under the loan agreement, or individual payments in response to each disbursement request. At trial, the government's evidence clearly showed that the individual payments by OPIC to independent businesses in two separate countries resulted from the separate disbursement requests, and were separate loan transactions.

In this case, the jury heard that, as to count 12, defendant allegedly made a false statement that a project cost for the Marble Mine was a Blockcutter for $596,000. ECF #58 at 17 (Jury Instructions); Exhibit 100 at 3 (First Disbursement Request). As a result of this submission by defendant, OPIC wired $596,000 to Gaspari Menotti in Italy for this piece of equipment. Exhibit 106 at 4. With regard to count 13, defendant allegedly made a false statement that a project cost for the Marble Mine was two Faudi chainsaws. ECF #58 at 17 (Jury Instructions); Exhibit 100 at 3 (First Disbursement Request). Following this submission by defendant, OPIC wired $821,742 to Afghan Stone Ltd. in Afghanistan for Faudi chainsaws as well as wire saw machines. Exhibit 106 at 5. These were two separate disbursements for distinct pieces of equipment to two separate companies in two different countries. That is, they were two separate loan transactions.

Nevertheless, it was not ineffective assistance of trial counsel to not challenge these counts pre-trial as allegedly multiplicitous. As one judge in this District recently noted in addressing and denying a pre-trial motion to dismiss an indictment count as multiplicitous where two counts charged misleading statements, "the D.C. Circuit has observed that the better practice would be to

defer the determination until after the trial. . . . While courts have recognized that some prejudice may arise from the accumulation of multiple charges, . . . . the duplication here does not significantly affect the overall heft of the indictment, and the harm that can flow from the existence of multiple charges can be ameliorated with proper jury instructions." *United States v. Manafort*, 313 F. Supp. 3d 311, 316 (D.D.C. 2018) (internal quotation marks and citations omitted). The court went on to note that "the primary evil of multiplicitous charges is that a defendant will be punished twice for the same offense[.]" *Id.* (internal quotes and citations omitted).

In this case, the Court properly instructed the jury to consider each offense separately. ECF #58 at 27. Further, whether the major fraud counts were charged in one count or three, or the false statements counts were charged in one or two counts, does not appear to change the potential sentence because the counts group for sentencing. *See, e.g.,* ECF #73 at 14, ¶¶ 51-52 (PSR) ("Count One through Twenty are grouped into a single Count Group"). Accordingly, it does not appear likely that the defendant will be punished twice for the same offense. Clearly it was not ineffective assistance of trial counsel not to challenge pre-trial counts 1-3 and 12-13.

### iv. Foreign business documents

Defendant makes a general argument that "the admission of *any* foreign documents from Gaspari Menotti was in error, and his counsel's failure to challenge them was ineffective. Without specifying which documents he refers to, he contends that the documents do not fall within the business records exception to the hearsay rules and, even if they did, they are inadmissible because Gaspari Menotti is an untrustworthy source. He has not, however, met the required showing under *Strickland* that his counsel's failure was deficient and, if deficient, that the deficiency prejudiced him. Accordingly, his motion should be denied on this basis.

The governments assumes for the purposes of this opposition that defendant is challenging

government exhibits 1-2, 3-12, 17-19, 26-36, and 433-435, which were obtained from Gaspari Menotti. The government notified defendant of its intent to admit these records under 18 U.S.C. §3505 well in advance of trial and defendant did not object to their admissibility at any point. ECF #21; Pretrial Conference Transcript, 9/5/2018, at 5-7 (acknowledging that the certification under 18 U.S.C. §3505 would "resolve the [defense] objection to the admission of" the Gaspari Menotti documents). Defendant's argument fails because the Gaspari Menotti documents are plainly business records, and he fails to show that Gaspari Menotti is an untrustworthy source. In any event, even if the Court concludes the documents were improperly admitted as business records, they would have been admissible under another exception to the hearsay rules, and were consistent with live witness testimony anyway. Thus, his counsel's failure to challenge them cannot be said to have been deficient.

The Gaspari Menotti documents are self-authenticating business records. They were obtained directly from Gaspari Menotti by Special Agent Carleen Watts and properly authenticated by a Gaspari Menotti employee pursuant to Section 3505.[5] In addition, all of the admitted exhibits were also authenticated by Gaspari Menotti employees with personal knowledge of them during live witness depositions. *See generally*, Deposition Transcripts of Paolo Corsini and Mauro Dazzi. Further, the challenged documents are on official Gaspari Menotti letterhead, display official Gaspari Menotti stamps or markings showing their origin, or were sent to or from Gaspari

---

[5] On 9/6/2018, the government clarified by email to the court and defense trial counsel that the Gaspari Menotti witness had not signed the type of certification that often accompanies business records in the United States because Italy does not have an equivalent concept of a business records certification. Rather, the witness was questioned by the U.S. Department of Justice Legal Attaché based in Rome regarding the authenticity of the documents provided. The questions asked and answers given of and by the witness were memorialized in writing, a copy of which was provided to defendant in discovery, and were consistent with and met the requirements of a "foreign certification" under §3505.

Menotti's mail server.  In short, nothing on the face of the documents suggests they were unreliable or not kept in the ordinary course of business.

Nevertheless, defendant argues they should not have been admitted as business records, pointing to a line of cases holding that the business records exception does not apply to documents drafted in response to unusual or isolated events.  In *United States v. Lemire*, 720 F.2d 1327, 1350-51 (D.C. Cir. 1983), the court affirmed the trial court's refusal to admit summary memoranda, finding that memoranda prepared as part of an investigation into substantial abnormal procedures are not prepared for a regular business purpose and therefore do not fall within the business records exception to the hearsay rules.  Similarly, in *United States v. Strother*, 49 F.3d 869, 876 (2nd Cir. 1995), the court found that the trial court had not abused its discretion in declining to admit as business records two substantive memoranda prepared in response to discrete events as business records.

Defendant's comparison to *Lemire* and *Strother* is unhelpful to him.  Although the Gaspari Menotti documents are unique, it cannot be said that they were created in response to unusual or isolated events.  Rather, they were created by Gaspari Menotti, at defendant's direction, as part of an actual business transaction that occurred between defendant and Gaspari Menotti.  Indeed, it was never suggested that the defendant did not purchase and pay for equipment from Gaspari Menotti and that equipment was not sent to Afghanistan.  Because the documents were not generated in response to unique events, *Lemire* and *Strother* do not control and they were properly admitted as business records at trial.

Defendant's argument that Gaspari Menotti is an unreliable source is unfounded.  To the extent that Gaspari Menotti created false documents, it did so *at his request*.  He cannot now suggest that Gaspari Menotti is inherently untrustworthy when its untrustworthiness is based

entirely on his own actions.

Even if, for the sake of discussion, trial defense counsel's failure to challenge the Gaspari Menotti documents on business records grounds was deficient, the challenged documents likely would have been admitted under Fed. R. Evid. Rule 801(d)(2)(C) ("a statement that was made by a person whom the party authorized to make a statement on the subject") or (E) ("the statement was made by the party's coconspirator during and in furtherance of the conspiracy"). Moreover, any prejudice to the defendant was minimal, at most, because the documents were all supported and corroborated by extensive live witness testimony. *See generally*, Deposition Testimony of Paolo Corsini and Mauro Dazzi. Thus, he cannot show any prejudice by his counsel's failure to challenge them as business records.

Accordingly, the Court should deny defendant's motion for a new trial on these grounds.

v.  Witnesses not called

Defendant claims that defense trial counsel failed to call three allegedly important witness who were present and available to testify. ECF #105 at 22-28.[6] As a result, defendant claims that he received ineffective assistance of counsel at trial. *Id.* at 28. As will be discussed below, defendant has failed to show, as required for a viable claim of ineffective assistance of counsel, that defense trial counsel was deficient or that that alleged deficient performance prejudiced the defense.

a.  Samiullah Dawoody

The first potential witness defendant mentions is Samiullah Dawoody who he says was

---

[6] Defendant's first sentence on this topic states that "[t]he complete failure to investigate potential witnesses cannot be construed as a strategic decision on the part of defense counsel." *Id.* at 22. It is clear from the record and the trial in this matter that this sentence has no application to this case. Defense counsel did extensive investigation, including of potential witnesses and exhibits. *See, e.g.*, ECF #41, Attachment D-1, Defense Witness List, and Attachment E-1, Defense Exhibit List.

ECM's Chief Financial Officer from February 2012 until December 2013. ECF #105 at 23. Defendant claims that "Dawoody had personal knowledge of ECM's financials, balance sheets, inventory, and took part in both internal and external audits. (Exhibit 33). Dawoody would have provided testimony, along with the audits discussed *supra* to show that most, if not all, of the equipment the Government alleged was never purchased was actually present and accounted for either at the Marble Mine and Marble Factory."[7] *Id.* Further, defendant claims that "[w]ithout Dawoody's testimony, the jury was left pondering where the OPIC loan proceeds went to." *Id.* at 25. As discussed below, defendant has not, however, met his burden to show that trial defense counsel not calling Dawoody as a witness was deficient performance or that alleged deficient performance prejudiced defendant.

Dawoody's time at ECM was two years after the loan and the subsequent fraudulent requests by Doost under the loan in 2010, so he would have no first-hand knowledge of those important matters, including for what the money was used in that time period. Further, much of defendant's argument here is a repeat of the argument as to the alleged audits. Those arguments were addressed above under the discussion of the audits, Section II.B.i, and his argument here fail for the same reasons as there. Further, the emails he cites in Exhibit 33 between Dawoody and Jeffrey Constantz (who testified at trial) in 2013 do not support his argument because they discuss alleged future planned audits. ECF #105-33, at 2 (Dawoody: "We are very closely working with Audit company to fix a time to start the audit of both companies."). Also, as with other evidence in the trial, they show ECM making excuses for why ECM was delinquent on the loan. ECF #105-33, at 2 (Constantz: "Who is your auditor and have you scheduled a payment for OPIC." Dawoody

---

[7] Defendant repeatedly makes arguments about equipment at the Marble Factory. The OPIC loan was only to pay for equipment at the Marble Mine and, accordingly, any lack of testimony as to equipment at the Marble Factory is irrelevant to defendant's arguments here.

responded with the name of the auditor for the scheduled audit and then gives reasons why they are not yet in a position to "be able to start OPIC Loan disbursement."). This information, which is consistent with Constantz's testimony at trial, *see, e.g.,* Trial Testimony, 9/13/2018, a.m. session, at 682 (defendant gave a number of reasons as to why ECM could not make payments on the loan); *id.* at 668-669 (same), would have been of little or no new value to defendant, and might have been harmful to his case. Finally, defense trial counsel elicited evidence on these issues and argued in closing about them.

### b.  Colonel Thomas H. Brittain[8]

The second potential witness defendant mentions is retired Colonel Thomas H. Brittain who served with the U.S. military near Herat, Afghanistan in July and August 2014. ECF #105 at 25. Defendant claims Brittain could have testified about the security risks to the Marble Mine, the economic benefit of the Marble Mine, the fact he flew over the Marble Mine, and the "importance of the Doost operation from a military standpoint." *Id.* at 25-26.

Defendant has not met his burden to show that trial defense counsel not calling Brittain as a witness was deficient performance or that alleged deficient performance prejudiced defendant. Most or all of what Brittain could have testified to would have been cumulative of other evidence or irrelevant. Brittain's time at Herat was four years after the loan and the fraudulent requests by Doost under the loan in 2010, so he would have no first-hand knowledge of those important matters, including for what the money was used for in that time period. He did not go to the Marble Mine, so he has no first-hand knowledge of what was there other than flying over it. The economic benefit of the Marble Mine was addressed at trial through both government witnesses and the

---

[8] Brittain was listed as a potential defense witness pre-trail. *See* ECF #41, Attachment D-1, Defense Witness List.

defense witness, Paul Lamoureux. Actually, it was, in part, that economic benefit that OPIC had hoped for when it loaned $15.8 million to ECM through Doost. *See, e.g.*, Trial Transcript, 9/11/2018, a.m. session, at 479-80 (Ms. Shepard testified about OPIC's desire for the loan to ECM to be a success and help grow the marble sector in Afghanistan); Trial Transcript, 9/11/2018, a.m. session, at 684 (Mr. Constantz testified about how OPIC viewed the loan as an opportunity to develop the Marble Mine and create jobs). The alleged importance of the Marble Mine from a military standpoint, however, would have been largely or completely irrelevant to the issues for the jury. Finally, defense trial counsel elicited evidence on many of these issues and argued in closing about them.

### c. Thomas Reott

The third and final potential witness defendant mentions is Thomas Reott who served with the U.S. State Department in Herat from July 2011 to July 2012. ECF #105 at 27. Defendant said Reott would have testified that transporting marble from the Marble Mine was difficult and that "[defendant] and his colleagues were making a legitimate effort to make things work in the face of security issues that presented themselves." *Id.*[9]

Defendant has not met his burden to show that trial defense counsel not calling Reott as a witness was deficient performance or that alleged deficient performance prejudiced defendant. Most or all of what Reott could have testified to would have been cumulative of other evidence or irrelevant, as already discussed above.

### vi. Count 15

Defendant claims that trial defense counsel "failed to even investigate possible defenses or

---

[9] Defendant's references to potential testimony by Reott about the Marble Factory are, as discussed above, irrelevant to this case. *See* footnote 6 above.

to uncover the totality of the exchange which formed the basis for [defendant's] conviction under [count 15]." ECF #105 at 28-29. Count 15 charges defendant with making a false statement in representing to OPIC he had no affiliate transactions that occurred during the quarter ending September 30, 2010. ECF #58 at 20 (Jury Instructions). Defendant does not specify, other than in general terms, what he contends trial defense counsel failed to do except by repeating his arguments from his motion for judgment of acquittal for lack of context and not providing the totality of the exchange. ECF #58 at 29. The government's consolidated response to defendant's argument regarding count 15 is located in Section II.A above. Defendant has not shown that his trial defense counsel was ineffective in this regard.

### vii. Jury instructions and verdict form

Finally, defendant makes a general allegation that trial defense counsel was ineffective for failing to object to or address allegedly faulty jury instructions and the verdict form, including as to the alleged false statement counts. ECF #105 at 29-30. Actually, as the Court knows, there was discussion between the Court and trial defense counsel about how to address the issue, either in the jury instructions or in the verdict form. Ultimately, the Court, with the agreement of the parties, revised the jury instructions to make the verdict form clear by, among others things, denoting which false statement was referenced in each count. *See, e.g.*, Trial Transcript, 9/18/2018, at 1097-98, 1115, 1118; ECF #58 at 20 (Jury Instructions) ("A chart summarizing Counts Fourteen and Fifteen is included below to assist you in completing the verdict form"). Defendant's claim of ineffective assistance of counsel in this regard in not supported by the record in this case.

### C. Defendant's attacks on the indictment are unfounded and untimely

Defendant acknowledges that a defense motion challenging the indictment other than before the trial is untimely. ECF #105 at 30. Nevertheless, he seeks to challenge parts of the

indictment claiming he has shown "good cause" for the challenge not having been made previously. That is, he alleges that there was ineffective assistance of counsel in the failure for trial counsel to have raised certain issues. As discussed below, these alleged failures by trial counsel was not ineffective assistance and current counsel's challenges should be rejected as unfounded and untimely.

i. <u>Defendant has not shown good cause so as to be allowed to make these challenges now</u>

Because defendant has acknowledged his attacks on the indictment are untimely, the only potential avenue to challenge on these two issues is his claim of ineffective assistance of counsel. *See, e.g., United States v. Weathers*, 186 F.3d 948, 958-59 (D.C. Cir. 1999). The defense claims of ineffective assistance of counsel as to these two issues is thus under the standard of *Strickland v. Washington*, 466 U.S. 668 (1984). "A *Strickland* claim has two components. First, 'the defendant must show that counsel's performance was deficient.' . . . Second, 'the defendant must show that the deficient performance prejudiced the defense.' . . . With regard to the first requirement, 'the defendant must overcome the presumption that . . . the challenged action might be considered sound trial strategy.'" *Weathers*, 186 F.3d at 958 (quoting *Strickland*, 466 U.S. at 687, 689).

As discussed as to each claim below, the defendant has failed to show that trial counsel was deficient and that such alleged deficiency prejudiced the defense. More specifically, as to alleged multiplicity, the counts were not multipicitous and, even to the extent they might have been, the remedy is in how they are addressed at sentencing.

With regard to the statute of limitations issue, defendant's argues that "there is no reasonable 'tactical decision' that could have motivated trial counsel from not objecting to the statute of limitations." ECF #105 at 43. As discussed in more detail below, this could not be further

from the truth. The WSLA plainly applies to toll the applicable statutes of limitations for each of the charged offense and its application is supported by ample case law.

Because defendant has not shown that defense trial counsel's decision to not challenge the indictment for the reasons cited was deficient or caused him prejudice, his claim of ineffective assistance must fail.

### ii. The indictment was not multiplicitous and, to the extent it was, the remedy is not the one defendant seeks

The government's consolidated response to defendant's argument that the indictment was multiplicitous is in Section II.B.iii above.

### iii. Statute of limitations challenges are unfounded based on the Wartime Suspension of Limitations Act, 18 U.S.C. § 3287

Defendant alleges that every count of the indictment except counts 2 and 3, are barred by the applicable statute of limitations and should be dismissed. ECF #105 at 36-39. Defendant refers the Court to the general statute of limitations for each of the offenses charged in the indictment, but does not address the applicability of the WSLA.

The WSLA suspends the statute of limitations for "any offense" involving fraud against the Federal Government during times of war. *Kellog Brown & Root Serves., Inc. v. U.S., ex rel. Carter,* -- U.S. --, 135 S.Ct. 1970, 1974 (2015). It reads:

> When the United States is at war or Congress has enacted a specific authorization for the use of the Armed Forces, as described in section 5(b) of the War Powers Resolution (50 U.S.C. 1544(b)), the running of any statute of limitations applicable to any offense (1) involving fraud or attempted fraud against the United States or any agency thereof in any manner, whether by conspiracy or not, or (2) committed in connection with the acquisition, care, handling, custody, control or disposition of any real or personal property of the United States, or (3) committed in connection with the negotiation, procurement, award, performance, payment for, interim financing, cancelation, or other termination or settlement, of any contract, subcontract, or purchase order which is connected with or related to the prosecution of the war or directly connected with or related to the authorized use of the Armed Forces, or with any disposition of termination inventory by any war contractor or Government agency, shall be suspended until 5 years after the termination of

hostilities as proclaimed by a Presidential proclamation, with notice to Congress, or by a concurrent resolution of Congress.

18 U.S.C. § 3287. Recognizing that the purpose of the WSLA is to combat fraud at times when the United States may not be able to act as quickly because it is engaged in war, courts have found the suspension period applicable to the hostilities in Iraq and Afghanistan irrespective of a declared war. *United States ex rel. Carter v. Halliburton Co.*, 710 F.3d 171 (4th Cir. 2013), *rev'd on other grounds*, — U.S. —, 135 S. Ct. 1970 (2015). Here, the WSLA applies to each of the charged offenses and extends the applicable statute of limitations that would ordinarily apply to make timely the offenses charged.

### a. The WSLA applies to the charges in the indictment

The WSLA applies to offenses for which "defrauding the United States in a pecuniary way" is an essential ingredient. *Bridges v. U.S.*, 346 U.S. 209, 220 (1953). Counts 1-11 clearly fall within the ambit of the WSLA because fraud is an essential ingredient of the offenses of Major Fraud against the United States and Wire Fraud. *See United States v. Melendez-Gonzalez*, 892 F.3d 9, 15 (1st Cir. 2018) (fraud is an element of Wire Fraud); *United States v. Merkel*, -- F.Supp.3d, 2019 WL 111035, *1-2 (D. Or. January 4, 2019) (fraud is an element of Major Fraud against the United States); *United States v. Verclas*, 2019 WL 95148, *7-8 (D. Md. January 3, 2019) (same); *United States v. Whyte*, 229 F.Supp.3d 484, 486, 491-495 (W.D. Va. January 26, 2017) (same).

Although no court appears to have considered whether the WSLA applies to 22 U.S.C. §2197(n), or the statute from which §2197(n) was derived, 18 U.S.C. 1014, courts have consistently held that the WSLA applies to violations of 18 U.S.C. §287 (False Claims) in situations involving conduct similar to this case. *See, e.g., United States v. Grainger*, 346 U.S. 235 (1953). In *Grainger*, the defendant was indicted on multiple counts of making false statements

to the Commodity Credit Corporation in order to obtain money. *Id*. at 241-243. The court found the normal statute of limitations was tolled by the WLSA because a violation of Section 287 "include[d] the making of claims upon the Government for payments induced by knowingly false representations." *Id*. The court distinguished a false claim under Section 287, involving falsity in a claim for payment, from a false statement under 18 U.S.C. §1001, which would involve falsity, but no claim for payment. *Id*.

Here, defendant was charged with four counts of making a "false statement or report for the purpose of *influencing the action of OPIC with respect to a loan*" in counts 12-15. ECF #1, at 11-12 (emphasis added). Although as the Court's jury instructions made clear, the government is not required to prove fraud to prove a violation of Section 2197, the same reasoning that brought Section 287 within the ambit of the WSLA in *Granger* applies to defendant's false representations to OPIC. ECF #58 at 18. At trial, the government's evidence proved that defendant did not merely lie to OPIC in loan documents; he lied as part of a complex scheme to obtain money from OPIC by deceit, and OPIC wired the loan proceeds to him on the basis of his material false representations. *Granger,* 346 U.S. at 253; *see also, United States v. Wells Fargo Bank, N.A.*, 972 F.Supp.2d 593, 610 (S.D.N.Y. September 24, 2013) (holding that a false claim for payment submitted to HUD involved fraud of a pecuniary nature).

Counts 12-13 of the indictment charge defendant with representing that a blockcutter purchased for $596,000 and two Faudi chainsaws were projects costs for the marble mining operation. ECF #1, at 11-12. The government proved the $596,000 invoice was false and generated at defendant's request for submission to OPIC as part of the first loan disbursement request. Exhibit 100. The government also proved that defendant had already been reimbursed by ASMED for the two Faudi chainsaws that he claimed were project costs for the Marble Mine.

Exhibit 106; Trial Transcript, 9/12/2018, a.m. session, at 581-82. Thus, defendant's false representations to OPIC as charged in counts 12-13 involved fraud—creating false documentation and double billing other agencies—rather than mere falsity, and were central to inducing OPIC to pay the first disbursement request.

Counts 14-15 charge defendant with falsely representing to OPIC that he had no affiliation with Afghan Stone, Saheb Zada, Big Five, and Diversified World in the second and third disbursement requests. ECF #1 at 12. In fact, as the Court knows, defendant controlled these entities, and his control was central to the fraud scheme because it allowed him to quickly move or withdraw the proceeds of the loan for his own benefit. *See, e.g.,* Exhibit 702 (Bank records for Saheb Zada showing defendant as president). Cindy Shephard testified extensively about OPIC need to understand defendant's affiliations, and how his failure to accurately state them was a material breach of the loan agreement. Trial Transcript, 9/11/2018, a.m. session, at 341-42, p.m. session, at 445-46.

Defendant's false statements to OPIC were simply a part of his overall scheme to defraud. Accordingly, fraud, rather than mere falsity, was also a central ingredient to counts 12-15, and the WSLA must apply.

The WSLA also applies to the counts 16-20 because fraud is an essential element of the money laundering charges in this case under 18 U.S.C. §1956(a)(1)(B)(i). As an initial matter, at least one court has found that the WSLA applies to a violation of Section 1956. *United States v. Anghaie*, 2011 WL 720044, *2 (N.D. Fl. February 21, 2011) and, perhaps more importantly, no court appears to have found that the WSLA does not apply to a violation of Section 1956 premised on wire fraud.

To prove that defendant was guilty of violating Section 1956, the government needed to

prove, *inter alia*, that he knowingly conducted or tried to conduct a financial transaction, knowing the money or property involved in the transaction were proceeds of some kind of unlawful activity, specifically, wire fraud. ECF #58 at 22. At trial, nearly the entire government's case focused on defendant's submission of false and fraudulent documents to OPIC in order to obtain the three loan disbursement charged in counts 1-3. The government further presented evidence that defendant carried out his scheme to defraud through the use of interstate wire communications, that is, the electronic wire transfers of funds from OPIC accounts to the shell companies. Exhibit 826 (Stipulation of the Parties); ECF #41, Attachment F (Stipulation #3). Because the specified unlawful activity for counts 16-20 was wire fraud directed at the United States, the WSLA applies to toll the applicable statute of limitations, and the charged offenses are not time-barred.

### b. The WSLA Tolls Applicable Statutes of Limitations

The WSLA tolls the general statute of limitations for statutes to which it applies when the United States is at war or Congress has enacted a specific authorization for the use of the armed forces (the "triggering clause") until after the termination of hostilities as proclaimed by a presidential proclamation, with notice to Congress, or by a concurrent resolution of Congress (the "termination clause"). *United States v. Smith*, 342 U.S. 225, 229-30 (1952); *United States v. Pfluger*, 685 F.3d 481, 483 (5th Cir. 2012).

For the purposes of this case, the WSLA was triggered by the authorization for use of military force enacted on September 18, 2001. *See Melendez-Gonzalez*, 892 F.3d at 15; *United States v. DeLia*, 906 F.3d 1212, 1218 (10th Cir. 2018); *United States v. Frediani*, 790 F.3d 1196, 1200 (11th Cir. 2015); *Pfluger*, 685 F.3d at 483 n.3. To date there has been no termination of hostilities in Afghanistan as proclaimed by a Presidential proclamation or concurrent resolution of Congress. *See, e.g., Frediani*, 790 F.3d at 1200-1201 (WSLA suspended running of statute of

limitations); *Pfluger*, 685 F.3d 481 (same); *Melendez-Gonzalez*, 892 F.3d at 15 (same). Because all of the offenses alleged in the indictment occurred in 2010 or later, well after the applicable triggering events for the WSLA, the running of the limitations period has not yet begun, and the charges are timely under the WSLA.

Accordingly, the Court should deny defendant's motion for a new trial on these grounds.

### D. Foreign Business Records

Finally, defendant renews his complaint that defense trial counsel's decision to not object to the admission of foreign business records from Gaspari Menotti, which he claims to be an untrustworthy source, was ineffective. ECF #105 at 20-22. The government's consolidated response to the defendant's arguments related to the Gaspari Menotti documents is located in Section II.B.iv of this brief, above.

### III.   Conclusion

For all of the foregoing reasons, the United States respectfully submits that defendant's combined motion to set aside the verdict as to count 15 or for a new trial is without merit and should be denied.

Respectfully submitted,

ROBERT A. ZINK
Acting Chief, Fraud Section

/ s /  *Daniel P. Butler*
_____
DANIEL P. BUTLER
D.C. Bar #417718
MICHAEL P. MCCARTHY
D.C. Bar #1020231
Trial Attorneys, Fraud Section
Criminal Division
United States Department of Justice
1400 New York Avenue, NW, Fourth Floor
Washington, D.C. 20530

(202) 307-2184 (Butler)
(202) 305-3995 (McCarthy)
Daniel.Butler2@usdoj.gov
Michael.McCarthy2@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on March 7, 2019, a copy of the foregoing document has been sent via

ECF to counsel of record for the defendant.

/ s / *Daniel P. Butler*
_____
DANIEL P. BUTER
MICHAEL P. MCCARTHY
Trial Attorneys, Fraud Section
Criminal Division
United States Department of Justice