**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )          **Criminal No. 1:17-CR-00109-APM** |
| | ) |
| **AZAM DOOST,** | ) |
| | ) |
| **Defendant.** | ) |

_____ )

## MEMORANDUM OPINION AND ORDER

### I.    INTRODUCTION

After an eight-day trial, a jury returned a verdict of guilty against Defendant Azam ("Adam") Doost on (1) three counts of major fraud against the United States in violation of 18 U.S.C. § 1031(a); (2) eight counts of wire fraud in violation of 18 U.S.C. § 1343; (3) four counts of making a false statement on a loan application or an extension in violation of 22 U.S.C. § 2197(n); and (4) five counts of money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i).  The jury acquitted Defendant on three counts of money laundering.  Following the jury's verdict, Defendant's trial counsel withdrew, and Defendant retained new counsel for the purpose of filing post-trial motions and sentencing.  With the assistance of new counsel, Defendant now files a motion pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure, seeking entry of a judgment of acquittal as to all counts or, in the alternative, a new trial.

For the reasons discussed below, the court denies Defendant's motion in large part.  The only exception is Defendant's contention that trial counsel was ineffective for failing to move to dismiss the false statements and money laundering counts as time barred.  The court defers ruling

on that issue until after the parties develop a factual record concerning the performance prong of the ineffectiveness claim and Defendant has had an opportunity to respond to arguments raised for the first time in the government's sur-reply.

## II.   BACKGROUND

A high-level summary of the trial evidence is sufficient for present purposes. These facts are recited in the light most favorable to the government. *See United States v. Kayode*, 254 F.3d 204, 212 (D.C. Cir. 2001).

Defendant Adam Doost and his brother owned a company named Equity Capital Group, LLC ("ECG") located in Dubai, United Arab Emirates. In or around 2006, an ECG subsidiary, Equity Capital Mining, LLC ("ECM") secured a 10-year lease on a marble mine located in Cheshti-i-Sharif, Afghanistan. At about the same time, the Doost brothers began to construct a marble processing factory in Herat, Afghanistan. The factory opened in May 2011.

On or about February 19, 2010, to finance the mining operations, Defendant executed a loan agreement between ECM and the Overseas Private Investment Corporation ("OPIC"), an agency of the United States government. The agreement called for OPIC to loan $15.8 million to ECM to develop, maintain, and operate the marble mine. Defendant was personally responsible for a matching capital contribution. As part of the loan agreement, Defendant promised that, on a quarterly basis, he would disclose "all transactions between the borrower"—ECM—"on the one hand," and "a Shareholder" of ECM—Defendant or his brother—or "any Affiliate of a Shareholder, on the other hand . . ." There was testimony presented at trial that accurate disclosure of these so-called "affiliate transactions" was a material to OPIC.

After OPIC approved the loan, Defendant and a business consultant submitted three requests to OPIC to disburse loan funds: (1) $7 million on April 18, 2010; (2) $7 million on July

15, 2010; and (3) $1.8 million on November 28, 2010. OPIC did not provide these funds directly to ECM. Rather, the loan agreement required ECM to submit purchase orders from vendors confirming the sale price of equipment, and OPIC in turn would pay the vendor directly for the invoiced amount.

The trial evidence showed that Defendant carried out a fraudulent scheme against OPIC in two related ways. First, Defendant failed to disclose any affiliate transactions to OPIC, when in truth there were many. Second, Defendant submitted invoices for equipment purchases that were demonstrably false or exhibited badges of fraud, such as sequential numbering or the absence of detail. The evidence showed that several of the purported vendors were owned or controlled by Defendant, his brother, and/or another relative. A reasonable jury could have concluded that these vendors were no more than shell companies. Financial records presented by the government established that these purported vendors did not conduct any actual business, and that within days of receiving a wire transfer from OPIC to pay for purported equipment, the money would be transferred to bank accounts in Dubai, after which the money could not be traced. In another instance, Defendant arranged to have an Italian equipment supplier submit false invoices to OPIC.

Ultimately, the OPIC loan went into default. ECM did not make any principal payments on the loan and left unpaid nearly $2 million more in interest.

## III. LEGAL STANDARD

On a motion under Rule 29, the court must consider the evidence in the light most favorable to the government and determine whether such evidence "it is sufficient to permit a rational trier of fact to find all of the essential elements of the crime beyond a reasonable doubt.'" *Kayode*, 254 F.3d at 212 (quoting *United States v. Harrington*, 108 F.3d 1460, 1464 (D.C. Cir. 1997)). The court must "accord[ ] the government the benefit of all legitimate inferences." *United States v.*

*Weisz*, 718 F.2d 413, 437 (D.C. Cir. 1983). Granting a motion for judgment of acquittal after a jury verdict is appropriate only where "a reasonable juror *must necessarily* have had a reasonable doubt as to the defendant['s] guilt." *Id.*

Under Rule 33, "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Courts enjoy "broad discretion" in deciding whether to grant a new trial. *United States v. Wheeler*, 753 F.3d 200, 208 (D.C. Cir. 2014). "A new trial motion is warranted only in those limited circumstances where 'a serious miscarriage of justice may have occurred.'" *Id.* (citation omitted).

## IV.   ANALYSIS

Defendant offers a battery of reasons why the court must vacate the guilty verdicts and enter judgments of acquittal or a new trial in his favor. The court takes these arguments in the order in which they appear in Defendant's motion.

### A.   The Alleged False Statement Underlying Count Fifteen is not Fundamentally Ambiguous.

Defendant begins by challenging the sufficiency of the evidence as to the false statements charge in Count Fifteen. The false statement at issue is Defendant's certification contained in an email to John Aldonas of OPIC, dated December 12, 2010, stating that "[t]here is no affiliate transaction have accurred [sic] during the quarter ending september 30th 2010." Def.'s Mot., Ex. 13, ECF No. 105-13.[1] In truth, multiple transactions took place between ECM and affiliated

---

[1] At trial, the government admitted only the certification portion of the email chain. *See* Def.'s Mot., Ex. 12, ECF No. 105-12. The entire exchange is reflected below, and it is this full exchange that Defendant asserts shows the fundamentally ambiguity of the inquiry to which he responded. *See* Def.'s Mot., Ex. 13, ECF No. 105-13.

Doost to Aldonis, Monday, December 13, 2010, at 9:47 am

Dear John

There is no affiliate transaction have accurred during the quarter ending september 30th 2010.

companies during the quarter in question.  Defendant nevertheless argues that, as to Count Fifteen,

he is entitled to judgment of acquittal because the exchange with Aldonis was "'fundamentally

ambiguous' such that a rational juror could not have found Doost guilty beyond a reasonable

doubt."  Def.'s Combined Rule 29 and 33 Mot., ECF No. 105 [hereinafter Def.'s Mot.], at 6.

Defendant's argument is without merit.

Although the D.C. Circuit has recognized that "some questions . . .  may be so vague as to

prohibit the government from even attempting to prove that the defendant knowingly answered

---

Best Regards,

Adam Doost

Aldonis to Doost, Monday, December 13, 2010, at 6:03 am

Adam,

Your attachments look like a forward looking list of 2011 affiliated transactions between ECM and your marble finishing company.

Perhaps I have confused things, but we are looking for you to certify quarterly, along with the quarterly financial statements, whatever affiliated transactions have taken place in that accounting period, and that they have taken place on an arms-length basis (with the evidence of this being the sales and volume detail along the lines you have just provided for 2011).  If it is the case – since for example the marble finishing operation is not yet processing material – then you could simply certify for the quarter ending Septbmer [sic] 30, 2010, that there were no Affiliated Transactions.  That said, I would ask that you carefully read the definition of Affiliated Transactions so you can consider what if any types of transactions might fit the reportable category.

. . .

Thanks,

John

Doost to Aldonis, Monday, December 13, 2010, at 7:48 am

Dear John

Attach is Affiliate Transaction Report

Best Regards,

Adam Doost

falsely," *United States v. Chapin*, 515 F.2d 1274, 1279 (D.C. Cir. 1975), such questions will be rare. "'[M]ere vagueness or ambiguity in the questions is not enough to establish a defense . . . [for] [a]lmost any question or answer can be interpreted in several ways when subjected to ingenious scrutiny after the fact.'" *Id.* (quoting *United States v. Ceccerelli*, 350 F. Supp. 475, 478 (W.D. Pa. 1972)). Instead, the alleged false answer must be "consider[ed] [ ] in context, taking into account the setting in which it appeared and the purpose for which it was used. This [is] a matter for the jury." *United States v. Milton*, 8 F.3d 39, 45 (D.C. Cir. 1993). It is up to the jury "to determine how the defendant construed the question or answer and to decide, in that light, whether the defendant knowingly gave a false answer." *Id.* at 46; *see also Chapin*, 515 F.2d at 1280 (observing that "the possibility that a question or an answer may have a number of interpretations does not invalidate either an indictment or a conviction after a jury charge which, as here, requires the jury to determine that the question as the defendant understood it was falsely answered in order to convict.").

Applying these principles, the court cannot override the jury's verdict on Count Fifteen. The jury could have reasonably found, and did find beyond a reasonable doubt, that Defendant knew he was making a false statement when he represented that there were "no affiliate transaction[s]" for the quarter ending September 30, 2010. To start, Defendant's exchange with Aldonis did not occur in a vacuum. It must be read in the context of the loan agreement with OPIC. That agreement required ECM to disclose, on a quarterly basis, "all transactions between [ECM], on the one hand, and a Shareholder or any Affiliate of a Shareholder, on the other hand." Def.'s Mot., Ex. 14, ECF No. 105-14 [hereinafter Loan Agreement], at 14. The loan agreement defined "Affiliate" to mean "with respect to any Person, (i) any other Person that is directly or indirectly controlled by, under common control with, or controlling such Person; . . . (iii) any

officer or director of such Person; or (iv) any spouse or relative of such Person."  *Id*. at 34.  The loan agreement further defined "Person" to include an "individual, a legal entity, including a partnership, a joint venture, a corporation, a trust, and an unincorporated organization[.]"  *Id*. at 40.  Defendant and his brother were shareholders of ECM, therefore the loan agreement required ECM to disclose any transactions between ECM and an "Affiliate" controlled by him or his brother.  When Defendant's answer is read together with the loan agreement and its definitions, the jury reasonably could have concluded that Defendant knew exactly what he was being asked when Aldonis referred to "Affiliated Transactions."

To the extent Aldonis created any confusion, he also gave guidance on what he precisely meant by "Affiliated Transactions."  In the last sentence of his email, Aldonis directed Defendant to the loan agreement's "definition of Affiliated Transactions so you can consider what if any types of transactions might fit the reportable category."  Def.'s Mot., Ex. 13, ECF No. 105-13.  The jury could have found that this statement dispelled any ambiguity or vagueness about what Aldonis was asking Defendant to report.

Finally, this was not the first time Defendant had certified to OPIC that there were no transactions to disclose between the shareholders of ECM and "affiliates."  Defendant made a similar disclosure five months earlier, on July 15, 2010, affirming that "[f]or the financial quarters ending March 31st and June 30th 2010, there were no affiliate transactions that occurred."  Trial Tr., Sept. 11, 2018 AM, at 391.  Defendant does not contend that there was any fundamental ambiguity about OPIC's June 2010 "affiliate transaction" inquiry, and the jury found him guilty of providing a knowing false response in that instance.  The same jury that found Defendant guilty of making a false certification in June 2010 reasonably could have concluded that Defendant knew he was making a nearly identical false certification five months later.

Defendant makes various arguments to support his assertion of "fundamental vagueness," but none are convincing. He contends that "it is nearly impossible to tell what the precise question was or to which question Defendant was responding." Def.'s Mot. at 9. But, as discussed above, when viewing the email in the context of all the evidence, a reasonable jury could have found Defendant knowingly provided a false answer to the inquiry concerning affiliate transactions. Additionally, Defendant asserts that the email exchange with Aldonis, and other referenced emails, demonstrate his "weak proficiency in the English language," *id.* at 10, which would have exacerbated his confusion about Aldonis's inquiry, *id.* at 12. Defendant's claimed "limited proficiency in the English language," *id.*, however, is nothing more than a self-serving statement that lacks any evidentiary support. And, in any event, he was free to make such an argument to the jury but did not. The court will not draw that conclusion now to override the jury's verdict. Finally, Defendant contends that the portion of his response in which he states that no affiliate transactions "have accurred"—a clear misspelling—is ambiguous and could be construed to mean "no affiliate transactions have *accrued*." (Emphasis added.) Once more, Defendant could have made this argument to the jury but did not, and, given the context, the jury readily could have understood Defendant to mean that "no affiliate transactions *have occurred*." Mere conjecture as to how the jury might have understood a misspelling cannot reverse its considered judgment.

Accordingly, for the foregoing reasons, the court denies Defendant's motion to enter a judgment of acquittal as to Count Fifteen.

### B.      Ineffective Assistance of Counsel

Defendant advances multiple grounds of ineffective assistance of counsel that he insists require the court to enter a judgment of acquittal as to all or certain counts, or to grant him a new trial. Two of Defendant's ineffectiveness claims concern trial counsel's failure to move to dismiss

counts of the indictment. *See* Def.'s Mot. at 15–19 (asserting ineffectiveness for not moving to dismiss certain counts as multiplicitous and all but two counts as time barred). The court considers those arguments not in this section, but in the next one concerning alleged defects in the indictment that warrant dismissal. In this section, the court addresses only those claims of ineffectiveness that relate to alleged shortcomings in counsel's performance at the trial itself.

The standard under *Strickland v. Washington* for an ineffectiveness claim is a familiar one. To be entitled to relief, a defendant must show "both that his counsel provided deficient assistance and that there was prejudice as a result." *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (citing *Strickland v. Washington*, 466 U.S. 669, 688 (1984)). As to the performance prong, a court must apply a "strong presumption" that counsel's performance was within the "wide range" of reasonable professional assistance. *Id.* (citation omitted). To overcome that strong presumption and prevail, a defendant must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* (citation omitted). The standard against which to assess trial counsel's performance is one of objective reasonableness. *See id.*

As for the prejudice prong, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the would have been different." *Id.* (internal quotation marks and citation omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (internal quotation marks and citation omitted). Some conceivable effect on the outcome is not sufficient, *see id.*, but rather, counsel's error "must be so serious as to deprive the defendant of a fair trial, a trial whose result is reliable," *id.* (internal quotation marks and citation omitted). Ultimately, under *Strickland*, the "question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not

whether it deviated from best practices or most common custom." *Id.* at 105 (quoting *Strickland*, 466 U.S. at 690).

### 1.  *Failure to Present Evidence of Equipment Value*

Defendant maintains that his trial counsel was ineffective for failing to present evidence to contradict the government's suggestion that ECM had not purchased equipment using the OPIC loan funds, when the produced discovery contained records showing that ECM possessed equipment valued at millions of dollars. Specifically, Defendant points to audited financial statements showing that EMC had assets valued at over $23 million in 2010 and over $25 million in 2011 and 2012. *See* Def.'s Mot. at 15 (citing Def.'s Mot., Exs. 15–17, ECF Nos. 105-15–105-17). Defendant also identifies two records that appear to be correspondence on the letterhead of the company that eventually acquired ECM, Greengate Group, that itemize various pieces of equipment that Greengate received from ECM. One record, dated July 18, 2017, lists the equipment that ECM transferred to Greengate in 2017. *See* Def.'s Mot., Ex. 19, ECF No. 105-19. The other, dated November 7, 2017, "confirm[s]" that Greengate "received" certain equipment, though it does not say from whom. *See* Def.'s Mot., Ex. 18, ECF No. 105-18. Although both letters bear signatures of Greengate officials, the recipient of neither letter is identified on its face and the circumstances under which the letters were drafted is not apparent. Finally, Defendant proffers that his new counsel hired forensic accountants who, based on the available records, were able to show "that most, if not all, of the equipment alleged to have never been purchased was accounted for in the sale to Greengate." *See* Def.'s Mot. at 17 (citing Def.'s Mot., Exs. 20–22, ECF Nos. 105-20–105-22). Ultimately, Defendant posits that, had his trial counsel presented the foregoing evidence, it would have undermined the government's suggestion that the OPIC funds

were used for purposes other than to purchase equipment, and it would have "completely negated intent." *Id.*

The court holds otherwise, finding that the failure to present the foregoing evidence does not undermine the court's confidence in the outcome of trial. The financial records in question are of limited probative value in multiple respects. For starters, those records in no way undermine the government's case that Defendant defrauded OPIC by purposely concealing affiliate transactions and by lying about them. *See* Indictment, ECF No. 1, at 8 ("Doost would report to OPIC that he did not have an affiliation with any companies [other than those he identified], . . . when in fact he had financial relationships with several vendors from which he purported to purchase equipment for the Marble Mine . . ."); *id.* ("Doost and his Business Partner would cause . . . transfer of funds from those vendors to companies and individuals with whom Doost was associated . . ."). The government's proof as to that theory of prosecution, by itself, is sufficient to sustain all but two of the convictions in this case.[2] Second, neither the certified audit reports nor the inventory lists compiled by Greengate can erase the false and misleading nature of the invoices submitted to OPIC. The government's proof established numerous badges of fraud associated with the invoices submitted to OPIC, such as the sequential numbering, the absence of detail, and the omission of VIN numbers. The evidence presented at trial further showed that Defendant participated in preparing these invoices, requested that a vendor in Italy prepare and transmit false invoices to OPIC, and submitted invoices to OPIC for expenses already paid by other aid organizations. Evidence regarding equipment possessed by EMC would not diminish the damaging nature of these facts. Finally, neither the records in question nor the proffered expert testimony would show that ECM bought the actual equipment that Defendant represented to OPIC

---

[2] The only exceptions are counts Twelve and Thirteen, which charge the making of false statements unrelated to the affiliate transactions.

was being purchased with the loan proceeds. Indeed, the experts themselves candidly acknowledge the limitation of their opinion and the evidence upon which they relied: "[Our services] did not include – physically observing the equipment, matching of serial numbers of the equipment from the purchase orders, tracing funds from either OPIC or Doost entities to bank accounts to the vendors . . ." *See* Def.'s Mot., Ex. 20, ECF Nos. 105-20, at 1. Thus, the mere fact that Greengate received *some* equipment when it purchased ECM does not establish that these acquired assets match the equipment that Defendant told OPIC that ECM was purchasing, or that Defendant in fact used the specific OPIC funds to make equipment purchases at all.

In short, Defendant was not prejudiced by trial counsel's failure to offer, at best, ambiguous records relating to the existence and value of equipment.

### 2.   *Failure to Object to the Admission of Foreign Business Records*

Part of the government's evidence at trial included records obtained from Gaspari Menotti, an Italian vendor of marble finishing equipment. The government gave the defense written notice under 18 U.S.C. § 3505 that it intended to offer these foreign records into evidence, and it obtained a certification as to their authenticity, as the statute permits. *See* Gov't Notice, ECF No. 21. The government also obtained a certification that the Gaspari Menotti records met the requirements of a "foreign record of regularly conducted activity" records, rendering them admissible notwithstanding the rule against hearsay. 18 U.S.C. § 3505(a). The court admitted the Gaspari Menotti records without objection from the defense. Defendant now claims that reasonable counsel would have objected to the admissibility of the Gaspari Menotti records. He contends that the records do not qualify as foreign business records under section 3505(a), because the evidence showed that a Gaspari Menotti official had fabricated some of the purchase orders, thereby placing

them "outside of regularly conducted business activity" and rendering them inadmissible. Def.'s Mot. at 22.

Defendant's argument fails because the Gaspari Menotti records at issue were admissible, irrespective of whether they qualify as business records. The records were not used to establish the truth of the matters asserted therein. To the contrary, the government used the records to show that they did *not* contain truthful information. As the Supreme Court held in *Anderson v. United States*, such out-of-court statements are not hearsay if "the point of the prosecutor's introducing those statements was simply to prove that the statements were made so as to establish a foundation for a later showing, through other admissible evidence, that they were false." 417 U.S. 211, 220 (1974); *see also United States v. Tann*, 532 F.3d 868, 872 (D.C. Cir. 2008) (holding that forged checks were admissible as not hearsay). That is precisely how the prosecution used the Gaspari Menoitti records here. As these records were admissible as non-hearsay, Defendant suffered no prejudice from his counsel's failure to object to them on the basis that they did not qualify as business records.

### 3. *The Failure to Call Certain Witnesses*

Next, Defendant contends that his counsel's performance was deficient because he failed to call certain "imperative" witnesses to testify. Def.'s Mot. at 22. Namely, he argues that competent trial counsel would have called (1) Samiullah Dawoody, the Chief Financial Officer of ECM from February 2012 until December 2013; (2) Colonel Thomas H. Brittain, who served as the Deputy Commander for International Security Assistance Force, Regional Command West, from July 2014 to August 2014; and (3) Thomas Reott, who served as the Head of the Political Section of the U.S. Consulate in Herat, Afghanistan, from July 2011 to July 2012. *See id.* at 22–28. The failure to call these witnesses did not prejudice the defense.

Defendant's assertions with respect to Dawoody rest on pure speculation. He contends that, if called to testify, Dawoody would have established "that most, if not all, of the equipment the Government alleged was never purchased was actually present and accounted for either at the Marble Mine and Marble Factory." *Id.* at 23. When combined with the audits, he posits, Dawoody's testimony "would have seriously called into doubt the Government's theory of the case." *Id.* The fundamental problem with these contentions is that Defendant has produced nothing, except a single, unilluminating email, *see* Def.'s Mot., Ex. 33, ECF No. 105-33 (under seal), to establish what Dawoody would have said if called to testify. Defendant instead *assumes* that Dawoody would have testified favorably regarding ECM's equipment assets based on his position as CFO at ECM and his presumed familiarity with ECM's audited financial statements. *See* Def.'s Mot. at 23. Defendant cannot manufacture prejudice based on how a witness *might* testify.

Defendant fares no better as to Colonel Brittain. Although Defendant at least submits an interview summary to support what Colonel Brittain would have said, *see id.*, Ex. 34, ECF No. 105-34, the facts Defendant claims Colonel Brittain would have established were already supplied by other witnesses and evidence. Specifically, there was ample proof presented about the "security threats posed directly to the Doost operations" and the "positive influence that the Doost operations provided the specific region of Herat, Afghanistan such as economic and safety stability," Def.'s Mot. at 25–26. *See, e.g.,* Trial Tr., Sept. 11, 2018 PM, at 455–59 (testimony of Cindy Shepard); Sept. 12, 2018 AM, at 587–89, 590–95, 597–98 (testimony of Quinton Collier); Sept. 13, 2018 AM, at 684–87 (testimony of Jeffrey Constantz); Sept. 14, 2018 PM, at 964 (testimony of Carleen Watts); Sept. 18, 2018 AM, at 1027–33, 1038 (testimony of Paul Lamoureux); Sept. 19, at 1252–53 (reading from Def. Ex. 91). And, contrary to Defendant's contention, *see* Def.'s Mot. at 26–

27, this evidence came in through witnesses other than Paul Lamoureaux, the sole witness Defendant called at trial, who Defendant now maintains was vulnerable to cross examination for bias. *See United States v. Mitchell*, 216 F.3d 1126, 1131 n. 2 (D.C. Cir. 2000) (finding no prejudice where witness's testimony would have been cumulative).

Finally, Reott's testimony would not have significantly moved the dial. Evidently, Reott visited the marble mine and the marble factory in 2012. He would have testified to observing an "impressive," "fully functional" marble factory, and would have spoken to the security issues of transporting unfinished marble from the mine to the factory. *See id.*, Ex. 36, ECF No. 105-36, at 1–2. According to Defendant, this unbiased "testimony would have demonstrated to the jury the legitimacy of Doost's operations." Def.'s Mot. at 27. In reality, Reott's testimony would have added little to what the jury already knew. As discussed, the jury heard ample evidence about the security difficulties with the marble operations. *See supra*. Additionally, Jeffrey Constantz, an employee of OPIC who monitored the loan to ECM, provided evidence of the factory's actual operations. Constantz testified that he had visited the marble factory for a ribbon cutting ceremony and communicated frequently with others who monitored operations. On cross-examination, Constantz admitted that the he had observed equipment at the factory and that he had received reports that the factory was producing marble. *See* Trial Tr., Sept. 13, 2018 AM, at 697–707.[3] The defense also admitted photographic evidence of factory operations through Constantz. *See id.* Additionally, Defendant conveniently omits unfavorable testimony that Reott likely would have provided. Although he observed operations at the factory, Reott also visited the marble mine and described it as "primitive" and lacking state-of-the-art equipment. If asked, and allowed to testify, Reott would have commented that "they must have used the majority of funds on the factory"—

---

[3] The government did not object to Constantz's testimony regarding what others told him about the marble factory's operations, so the court did not exclude such testimony as hearsay.

an unfavorable bit of testimony, as OPIC loaned funds to support the mining operations, not the factory. *See* Def.'s Mot., Ex. 36 at 2. Simply put, Reott's testimony could have done as much harm as good. Therefore, counsel's failure to call Reott therefore did not prejudice Defendant.

4.      *Counsel's Failure to Admit the Entire Email Exchange with Aldonis*

Defendant further criticizes trial counsel for allowing the prosecution to admit only Defendant's email response to Aldonis confirming the absence of any affiliate transactions from the December 13, 2010, email exchange with Aldonis, instead of the entire exchange. *Compare* Def.'s Mot., Ex. 12 *with id.*, Ex. 13; *see* note 1 *supra*. Defendant contends that the full exchange is "exculpatory" and "had counsel proffered the entire alleged false statement, within its natural context, the jury would have seen the fundamentally ambiguous nature of the exchange." Def.'s Mot. at 29. The court agrees that it would have been better for trial counsel to have demanded admission of the full email. But, for the reasons already discussed, trial counsel's failure to do so did not prejudice Defendant. Even with the benefit of the whole exchange, a reasonable jury would not have found the exchange with Aldonis to be "fundamentally ambiguous." *See supra*.

5.      *Failure to Object to Verdict Forms*

Defendant's final trial-related claim of ineffectiveness is that the jury verdict form did not pair each false statements count (Counts Twelve through Fifteen) with the alleged false statement itself, thereby risking jury confusion, and trial counsel was neglectful in not addressing this defect. *See* Def.'s Mot. at 29–30; Verdict Form, ECF No. 53, at 3–4. But the claimed deficiency in the jury form was addressed by the jury instructions. For each false statements count, the instructions identified the alleged false statement associated with that particular count. *See* Final Jury Instructions, ECF No. 58, at 17, 20–21. The instructions therefore made clear to the jury precisely which false statement was associated with which false statements count. Accordingly, trial counsel

committed no error by not insisting that verdict form also pair the counts and alleged false statements.

### 6. *Cumulative Effect of Trial Errors*

Although Defendant does not say so expressly, his papers suggest that he believes that, even if any single error by trial counsel was not prejudicial, the cumulative effect of multiple errors did result in prejudice. *See* Def.'s Mot. at 29 ("This failure to investigate is just another piece in the puzzle but exemplifies the ineffective assistance Doost received as a whole."); *see also United States v. Weaks*, 840 F. Supp. 2d 12, 18 (D.D.C. 2012) (stating that "a court must consider the cumulative effect of counsel's errors"). The court cannot agree. In this case, the individual parts do equal the whole. None of the claimed trial errors, even considered together, deprived "the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687.

### C. **Challenges to the Indictment**

The indictment in this case charged Defendant with 23 individual counts. Trial counsel did not file a pre-trial motion to dismiss any of them. Although motions that challenge the indictment ordinarily must be filed before trial, *see* Fed. R. Crim. P. 12(b)(3)(B), the court may review an untimely claim where a defendant shows "'good cause' for failure to raise a claim by the deadline," *id.* (advisory committee note to 2014 amendments). Here, Defendant asserts as "good cause" trial counsel's ineffectiveness in failing to attack the flawed indictment. *See* Def.'s Mot. at 30–32 (citing cases); *see also United States v. Weathers (Weathers I)*, 186 F.3d 948, 952, 958–59 (D.C. Cir. 1999) (remanding for hearing where ineffectiveness identified as "cause" for the non-filing of a multiplicity challenge).

A "good cause" showing based on ineffectiveness, however, requires more than just succeeding in establishing a defect in the indictment. In this context, "[t]he crux of an ineffective

assistance claim is not simply whether trial counsel neglected to press a viable legal argument, but whether counsel's failure to do so was objectively unreasonable under the circumstances." *United States v. Weathers*, 493 F.3d 229, 234 (D.C. Cir. 2007). Thus, for the court to consider an untimely challenge to the indictment, the defendant must show that trial counsel's failure to file a timely pre-trial motion fell below the objective standard of reasonableness *and* that defendant would have prevailed on such motion. *See id.* at 235, 238.

In this case, Defendant *presumes* the unreasonableness of trial counsel's failure to challenge the indictment. Indeed, he offers not an iota of evidence that would show either that his counsel completely neglected to consider a particular legal argument or that his counsel did not make a reasonable tactical judgment in not making a challenge. To be fair, it is hard to conceive of a strategic reason for counsel not to have raised at least some of the arguments Defendant now advances, such as that many of the counts are time barred. *See United States v. Palomba*, 31 F.3d 1456, 1466 (9th Cir. 1994) ("With regard to *Strickland*'s deficient performance prong, no apparent or plausible tactical decision could explain counsel's failure to move for dismissal, potentially with prejudice, of an untimely charge . . .."). Nevertheless, the court is not prepared at this time to find trial counsel was ineffective absent some evidentiary showing that their inactivity on pre-trial motions was not a strategic decision. *See Weathers I*, 186 F.3d at 958.

That said, as discussed below, the court finds that certain attacks on the indictment would not have succeeded, even if trial counsel had raised them. In other words, these are arguments as to which the court finds that Defendant cannot show prejudice.

### 1.    *Multiplicitous Counts:  One Through Three*

Defendant starts with the assertion that Counts One through Three were multiplicitous. *See* Def.'s Mot. at 32–35.  Multiplicitous counts are those that improperly charge a single offense

in more than one count.  *See United States v. Cooper*, 886 F.3d 146, 149 (D.C. Cir. 2018) ("Charging the same offense in more than one count—a problem known as multiplicity—is a defect in the indictment.") (cleaned up).  Counts One through Three accused Defendant of major fraud against the United States in violation of 18 U.S.C. § 1031(a), with each count corresponding to a loan disbursement request submitted by Defendant to OPIC.  Defendant insists that Counts One through Three should have been presented to the jury as a single count, because, under section 1031(a), the unit of prosecution is an "execution" of a scheme to defraud and, in this case, "once approved for the preconceived $15.8 million loan and the singular loan agreement was signed . . . , the alleged scheme was executed."  Def.'s Mot. at 33.  Stated differently, Defendant argues that, the alleged scheme was "executed" once OPIC approved the loan, making that transaction the single unit of prosecution and the individual loan disbursements mere acts in furtherance of the scheme but not separate "executions."

In *United States v. Bruce*, the D.C. Circuit faced a question like the one presented here but under the similarly worded bank fraud statute, 18 U.S.C. § 1344.  *See* 89 F.3d 886 (D.C. Cir. 1996). There, the question was one of duplicity (not multiplicity) of an indictment that charged the submission of four separate fraudulent loan applications over three months in a single count.  *See id.* at 888.  The defendant argued that the one count should have been separated into four, because each loan application was a separate "execution."  *See id.* at 889.  Like the major fraud statute, the bank fraud statute "makes each 'execution' of a fraudulent scheme punishable as a separate count." *Id.* at 889.  But not every act in furtherance of the scheme constitutes a separate violation.  As the court explained: "It is settled law that acts in furtherance of the scheme cannot be charged as separate counts unless they constitute separate executions of the scheme, and that acts which *do* constitute individual executions *may* be charged separately."  *Id.* (citation omitted).  The difficulty,

the court recognized, was in discerning between the two: "[T]he actions that tend to prove the existence of the scheme will often be the actions actually taken to execute the scheme." *Id.* at 889–90 (quoting *United States v. Hammen*, 977 F.2d 379, 383 (7th Cir. 1992)).  To decide whether the count in question was duplicitous, the court looked to the manner in which the indictment was written and held that, because the indictment carefully charged only one execution of the scheme, the sole count incorporating the four fraudulent loan applications was properly charged as a single count.  *See id.* at 890.

*Bruce* is instructive insofar as it recognizes the difficulty in differentiating between a chargeable execution and a non-chargeable act in furtherance of the scheme.  But *Bruce* does not answer how a court should distinguish between the two concepts, and neither the parties nor the court has identified a case from the D.C. Circuit that does so.  *Cf. United States v. Pless*, 79 F.3d 1217, 1220 (D.C. Cir. 1996) (confirming in a bank fraud case that the "unit of prosecution is not the scheme but the execution" but providing no further guidance on distinguishing between the two).  To that end, the court finds helpful the Tenth Circuit's discussion in *United States v. Gallant*, 537 F.3d 1202 (10th Cir. 2008).  A case involving bank fraud, the court in *Gallant* observed that, when determining whether a single or multiple executions of bank fraud have taken place, "the question is heavily fact-dependent," *id.* at 1226, and involves a number of factors, including "the number of banks, the number of transactions, and the number of movements of money involved in the scheme," *id.* (quoting *United States v. Brandon*, 17 F.3d 409, 422 (1st Cir. 1994)).  The court accepted as a general proposition, however, that "[e]ach time an identifiable sum of money is obtained by a specific fraudulent transaction, there is likely to be a separate execution of the scheme to defraud." *Id.* (quoting *Brandon*, 17 F.3d at 422).  Ultimately, the court explained, "[t]he central question for determining multiplicity is whether a jury could plausibly find that the actions

described in the disputed counts of the indictment, objectively viewed, constituted separate executions of the bank fraud scheme." *Id.* (internal quotation marks and citation omitted). In *Gallant*, the court found that thirteen separate transfers of money were each a separate execution of the scheme. *See id.*

Applying the principles of *Gallant* here, the court finds that the jury in this case plausibly could have found that each of the three loan disbursements by OPIC comprised a separate execution. Though the scheme here involved a single entity—OPIC—and a single loan agreement, the loan's terms permitted ECM to secure funds only through quarterly disbursements of not less than $500,000 and no greater than $7,000,000. Trial Tr. Sept. 11, 2018 AM at 354. Each disbursement request required Defendant to submit supporting purchase orders or invoices equal to the amount sought to be disbursed. Defendant undertook to do just that, using a different set of false or fraudulent records for each of the three disbursement requests: (1) April 18, 2010, for $7 million; (2) July 16, 2010, for $7 million; and (3) November 28, 2010, for $1.8 million. The jury could have viewed each of these disbursement requests as a separate "execution" of the fraud scheme. *See Gallant*, 537 F.3d at 1226; *see also United States v. Mancuso*, 42 F.3d 836, 848 (4th Cir. 1994) (finding that "each separate check diverted from [the bank] properly can be deemed a separate execution of a scheme to defraud the bank"); *United States v. Allender*, 62 F.3d 909, 913 (7th Cir. 1995) (holding "the four loans challenged in this case are separate executions").

The court is unpersuaded by Defendant's contention that, because the three loan disbursements are "integrally related," they together constitute a single charge. *See* Def.'s Mot. at 33 (citing *United States v. Heath*, 970 F.2d 1397, 1402 (5th Cir. 1992)). To be sure, each loan disbursement is rooted in the same loan agreement. But the disbursements are not "integrally related" in the sense that "one could not have succeeded without the other." *Heath*, 970 F.2d at

1402.  Rather, Defendant submitted each disbursement request on its own terms, with each individual request directed to different equipment purchases for the marble mine's operations.  *See* Def.'s Mot., Ex. 21 (Defendant's expert schedule summarizing equipment associated with each disbursement request).  The government therefore properly charged Counts One through Three as separate counts.[4]

### 2.    *Multiplicitous Counts:  Counts Twelve and Thirteen*

Defendant also asserts that his counsel was ineffective for not moving to dismiss as multiplicitous Counts Twelve and Thirteen.  *See* Def.'s Mot. at 35–36.  Those counts charged Defendant with making false statements in connection with the first loan disbursement.  Count Twelve charged Defendant with falsely stating that a $596,000 Blockcutter from Gaspari Menotti was a "project cost" of the marble mine, when in truth ECM did not purchase a Blockcutter from Gaspari Menotti.  Count Thirteen charged Defendant with falsely stating that two Faudi chainsaws were a "project cost" of the marble mine, when in fact another development organization already had paid for the chainsaws.  Relying on the D.C. Circuit's statement in *United States v. Mangieri* that "the making of a number of a false statements to a lending institution in a single document constitutes only one criminal violation under 18 U.S.C. § 1014," Defendant argues that the government should have brought Counts Twelve and Thirteen in a single count, because the two alleged false statements were made in the same disbursement request.  *See* Def.'s Mot. at 35

---

[4] The court notes that the typical remedy for a multiplicitous indictment—election of counts—would make little sense here.  Such a remedy would mean the Defendant would then stand convicted of defrauding the United States of less than $15.8 million, a result contrary to the jury's verdict.  The more sensible remedy would be merger of counts at sentencing, so that Defendant would be held responsible for the entire amount of the fraud, as the jury found. *See* Wright, Leipod et al., 1A Fed. Prac. & Proc. Crim. § 145 (4th ed.).  Relatedly, it is possible that trial counsel decided not to challenge Counts One through Three as multiplicitous because the remedy would have been merger, not election, of counts.  Alternatively, counsel might have determined such challenge to be a hollow endeavor, because the government then could have brought a superseding indictment with a single count of major fraud.  *Cf. Weathers*, 186 F.3d at 958.

(quoting *U.S. v. Mangieri*, 694 F.2d 1270, 1281 (D.C. Cir. 1982) (quoting *United States v. Sue*, 586 F.2d 70, 71 (8th Cir. 1978) (per curiam)).

Defendant accurately quotes from *Mangieri*, but the Circuit in that case also allowed that "we do not foreclose the possibility that under some circumstances multiple misrepresentations might justify separate offenses . . ." *Mangieri*, 694 F.2d at 1282. This case qualifies for such exception. The false statements statute in this case, 22 U.S.C. § 2197(n), is patterned on the one at issue in *Mangieri*, 18 U.S.C. § 1014, which criminalizes the making of a false statement to a lending institution. *Mangieri* is therefore instructive. The court there observed that "18 U.S.C. § 1014 is targeted at fraudulent loan *transactions*, rather than the particular falsehoods used to achieve the illegal transaction." *Mangieri*, 694 F.2d at 1282 (emphasis in original). For that proposition, the court cited *United States v. O'Neill*, 463 F. Supp. 1200 (E.D. Pa. 1979), a case in which the court observed that section 1014 "seeks to prevent losses to federally insured banks resulting from fraudulent transactions . . . . [I]t is the attempt to induce a fraudulent transaction, and the losses to federally insured banks resulting therefrom, rather than simply the falsehoods, which Congress was seeking to prevent," *id.* at 1203–04 (citation omitted). It follows from *Mangieri* and *O'Neill* that, just as the unit of prosecution for a violation of section 1014 is the induced illegal transaction, not the made falsehood, the same holds true for section 2197(n).

Viewed in this way, Counts Twelve and Thirteen are appropriately charged as separate counts because each false statement "induce[d] a [different] fraudulent transaction" and resulted in a separate loss for OPIC. *O'Neill*, 463 F. Supp. at 1203. Each false statement triggered an individualized transmittal of OPIC funds to a different purported vendor. The false statement charged in Count Twelve caused OPIC to wire $596,000 to Gaspari Menotti, and the false statement charged in Count Thirteen caused OPIC to wire $821,742 to Afghan Stone Ltd. As the

government succinctly states, "[t]hese were two separate disbursements for distinct pieces of equipment to two separate companies in two different countries." Gov't's Opp'n to Def's Mot., ECF 106, at 18. Indeed, it is pure happenstance that Defendant put both false statements into the first disbursement request. Each easily could have been in a separate request, and thus given rise to separate counts. This is not a case like *Mangieri* where the defendant made over a dozen material omissions to secure a single loan (though he repeated such conduct on nine different loan applications and consequently was charged with nine counts of making false statements). Because the unit of prosecution under section 2197(n) is the "fraudulent . . . *transaction*," *Mangieri*, 694 F.2d at 1282, and each false statement charged here precipitated its own separate illegal transaction, Counts Twelve and Thirteen are not multiplicitous. Accordingly, Defendant cannot show prejudice arising from his counsel's failure to make such argument.

### 3. All Counts but Count Two and Three are Time Barred

Defendant makes the startling assertion that each count of the indictment but two—Counts Two and Three—is time barred, and Defendant's counsel was ineffective for moving to dismiss on that ground. *See* Def.'s Mot. at 36–38. The grand jury returned the indictment on June 7, 2017. *See* Indictment (docketed on June 7, 2017). Thus, to be timely, the "executions" of the major fraud had to have occurred on or after June 7, 2010, *see* 18 U.S.C. § 1031(f) (establishing seven-year limitations period), and all other charged conduct had to have occurred on or after June 7, 2012, *see* 18 U.S.C. § 3282(a) (setting general five-year limitations period for federal crimes). The "execution" alleged in Count One—the first disbursement request—occurred *before* June 7, 2010, on April 18, 2010, making that count untimely, Defendant asserts. *See* Indictment at 9. The "executions" in Counts Two and Three—the second and third disbursement requests—are alleged to have happened *after* June 7, 2010, on July 16, 2010, and November 28, 2010, respectively,

rendering those counts timely.  But as to all other offense conduct, the latest-in-time charged crime

appears in Count Twenty-Three, a money laundering offense alleged to have occurred *before* June

7, 2012, on August 31, 2011.  *See id.* at 9–14.  Thus, Defendant contends, Counts Four through

Twenty-Three are time barred under the applicable five-year limitations period.

If the question of the indictment's timeliness were as straightforward as Defendant makes

it seem, he would be justified in accusing his trial counsel of ineffectiveness, and likely would

prevail.  But, not surprisingly, the limitations analysis is not so simple.  The government responds

that the Wartime Suspension of Limitations Act ("WSLA" or "the Act"), 18 U.S.C. § 3287, applies

in this case and extends the applicable limitations period.  By the Act's operation, the government

contends, the limitations period has not expired as to any count of the indictment.  *See* Gov't Opp'n

at 16, 28–33.

The WSLA provides as follows:

> When the United States is at war or Congress has enacted a specific
> authorization for the use of the Armed Forces, as described in
> section 5(b) of the War Powers Resolution (50 U.S.C. 1544(b)), the
> running of any statute of limitations applicable to any offense
> (1) involving fraud or attempted fraud against the United States or
> any agency thereof in any manner, whether by conspiracy or not, or
> (2) committed in connection with the acquisition, care, handling,
> custody, control or disposition of any real or personal property of
> the United States, or (3) committed in connection with the
> negotiation, procurement, award, performance, payment for, interim
> financing, cancelation, or other termination or settlement, of any
> contract, subcontract, or purchase order which is connected with or
> related to the prosecution of the war or directly connected with or
> related to the authorized use of the Armed Forces, or with any
> disposition of termination inventory by any war contractor or
> Government agency, shall be suspended until 5 years after the
> termination of hostilities as proclaimed by a Presidential
> proclamation, with notice to Congress, or by a concurrent resolution
> of Congress.

18 U.S.C. § 3287. The government's invocation of the WSLA gives rise to several contested issues, which the court takes one at a time.

<h4 style="text-align:center;">a.   <u>Does the WSLA apply?</u></h4>

The parties agree that Congress's authorization of the use of force in the aftermath of September 11, 2001, triggers the WSLA for purposes of this case. *See* Authorization for Use of Military Force, Pub. L. No. 107–40, 115 Stat. 224 (2001); *United States v. Frediani*, 790 F.3d 1196, 1200 (11th Cir. 2015). They disagree, however, as to whether hostilities have "terminated," such that the applicable limitations period would have started to accrue from the date of "termination."

Defendant relies on a single district court decision, *United States v. Prosperi*, *see* Def.'s Reply in Support of Def's Mot., ECF No. 115 [hereinafter Def.'s Reply], at 14, for the proposition that hostilities in Afghanistan have terminated. There, the court held that hostilities in Afghanistan expired on December 22, 2004, when "the United States formally recognized and extended full diplomatic relations to the new government of Hamid Karzai." *United States v. Prosperi*, 573 F. Supp. 2d 436, 455 (D. Mass. 2008). But *Prosperi*'s holding has been uniformly rejected. At least three circuit courts have explained that the *Prosperi* court failed to account for the plain textual requirement of the WSLA that a declaration of the end of hostilities must be made either "by a Presidential proclamation, with notice to Congress, or by a concurrent resolution of Congress," neither of which has occurred with respect to the use of force in Afghanistan. *See Frediani*, 790 F.3d at 1200–01 (concurring with decisions from the Fourth and Fifth Circuits). This court agrees with this critique of *Prosperi*. "Hostilities" thus have not "terminated" for purposes of the WSLA.

b.      What sub-clause of the WSLA applies?

The WSLA does not reach all federal crimes.  Rather, as relevant here, the statute sets forth three categories of offenses to which it applies:  (1) any offense "involving fraud or attempted fraud against the United States or any agency thereof in any manner, whether by conspiracy or not"; (2) any offense "committed in connection with the acquisition, care, handling, custody, control or disposition of any real or personal property of the United States"; and (3) any offense "committed in connection with . . . any contract, subcontract, or purchase order which is connected with or related to the prosecution of the war or directly connected with or related to the authorized use of the Armed Forces . . . "  18 U.S.C. § 3287.  The Supreme Court has directed that these clauses must be "narrowly construed," because they are exceptions to the general policy in favor of repose.  *Bridges v. United States*, 346 U.S. 209, 216 (1953) (quoting *United States v. McElvain*, 272 U.S. 633, 639 (1926)).

In this case, the government has shifted positions as to which of the WSLA's three sub-clauses operates to suspend the limitations period.  When it initially responded to Defendant's motion, the government invoked only the first clause covering offenses of fraud or attempted fraud against the United States.  Gov't Opp'n at 29–32.  But after the court granted the government leave to file a sur-reply, it expanded its view and now maintains that *all three* clauses are applicable.  *See* United States' Reply to Def's Reply, ECF No. 125 [hereinafter Gov't Sur-Reply], at 7–14.

For reasons the court will explain later, it does not at this time resolve whether sub-clauses (2) and (3) apply in this case.  The court eventually may have to answer that question, but for present purposes it will address the applicability of sub-clause (1) only.  The court now turns to that issue.

The Supreme Court has held, with respect to sub-clause (1) of the WSLA, that "the wartime suspension of limitations authorized by Congress is limited strictly to offenses in which defrauding or attempting to defraud the United States is an essential ingredient of the offense charged." *United States v. Bridges*, 346 U.S. 209, 221 (1953); *United States v. Grainger*, 346 U.S. 235, 242 (1953) (stating that offenses covered by sub-clause (1) "are limited to those which include fraud as an essential ingredient"). In *Bridges*, the Court held that the WSLA did not apply to offenses charging making a false statement under oath in naturalization proceedings, because the offenses did not "involve [] defrauding [] the United States in any pecuniary manner or in a manner concerning property." 346 U.S. at 221.

In a companion case to *Bridges*, *United States v. Grainger*, the Court held that the WSLA applies to charges brought under the criminal false claims clause of the False Claims Act, 18 U.S.C. § 287; 346 U.S. 235, 242–43 (1953). The Court explained: The "substantive offenses [ ] charged include the making of claims upon the Government for payments induced by knowingly false representations . . . . The statement of the offenses here carries with it the charge of inducing or attempting to induce the payment of a claim for money or property *involving the element of deceit that is the earmark of fraud*." *Id.* (emphasis added). By contrast, the court observed, the WSLA did not apply to the criminal false statements clause of the False Claims Act, 18 U.S.C. § 1001, because that offense "contains no such ingredient." *Id.* at 243.

*Bridges* and *Grainger* lead to the inescapable conclusion that the WSLA covers Count One charging Defendant with major fraud against the United States. *See United States v. Merkel*, 357 F. Supp. 3d 1060, 1063 (D. Or. 2019) (applying the WSLA to a prosecution for major fraud against the United States); *United States v. Verclas*, Case No.: GJH-18-160, 2019 WL 95148, at

*7–8 (D. Md. Jan. 3, 2019) (same); *United States v. Whyte*, 229 F. Supp. 3d 484, 486, 491–95 (W.D. Va. 2017) (same). An "essential ingredient" of that offense is defrauding the United States. The statute of limitations therefore has not run on Count One, and Defendant was not prejudiced by trial counsel's failure to challenge its timeliness. Defendant does not contend otherwise. *See* Def.'s Reply at 15 (arguing only that Counts Twelve through Twenty-Three remain time barred even if the WSLA applies).[5]

The more interesting question is whether the WSLA reaches the false statements charges arising under 22 U.S.C. § 2197(n)—Counts Twelve through Fourteen—and the money laundering offenses arising under 18 U.S.C. § 1956(a)(1)(B)(i)—Counts Sixteen through Twenty-Three. The answer turns on the question whether the Supreme Court in *Bridges* and *Grainger* understood the WSLA to cover only those offenses that contain "fraud . . . against the United States" as an *element* of the offense, or whether the Act extends to charged offenses supported with evidence of fraudulent intent but that do not necessarily require fraudulent intent as an element of proof. Defendant takes the former position; the government takes the latter. Defendant has the better argument.

*Bridges* makes clear that, when deciding whether the WSLA applies to an offense, a court must look to the *elements* of the offense, not the manner of indictment or the proof at trial. In that case, the defendants were charged with making a false statement in a naturalization proceeding. Finding that such offense fell outside the WSLA, the Court reasoned that, "[i]n that offense, as in the comparable offense of perjury, fraud is not an essential ingredient. The offense is complete

---

[5] Defendant does *not* argue that the wire fraud offenses in Counts Four through Eleven fall outside the WSLA's coverage. *See generally* Def.'s Reply. The court therefore does not consider whether those counts are subject to the WSLA.

without proof of fraud, although fraud often accompanies it."  346 U.S. at 222.  The Court reached

the same conclusion as to the charge of aiding and abetting the false statements offense.

> If, as here, the main offense is complete with the proof of perjury, the suspension does not apply to the charge of aiding in the commission of that offense.  *The insertion in the indictment of the words "procured by fraud" does not change the offense charged.*  The embellishment of the indictment does not lengthen the time for prosecution.  *It is the statutory definition of the offense that determines whether or not the statute of limitations comes within the Suspension Act.*

*Id.* 222–23 (emphasis added).  These passages from *Bridges* establish that the focus of the coverage

question under the WSLA are the statutory elements of the charged offense, not the framing of the

indictment or the proof presented at trial.  *See United States v. DeLia*, 906 F.3d 1212, 1219 (10th

Cir. 2018) ("To determine whether the Suspension Act applies, we must evaluate the elements of

the charged offense.") (citing *Bridges*, 346 U.S. at 222–23).  If the "statutory definition of the

offense" lacks fraud as an element, the ordinary limitations period applies.

Here, neither the false statements charges nor the money laundering charges required proof

of fraud to secure a conviction.  Section 2197(n) demands the government prove only that the

defendant made the false statement or report "for the purpose of influencing in any way" an action

of OPIC.  22 U.S.C. § 2197(n).  It does not require an intent to deceive or defraud.  Although no

court appears to have addressed this question directly under section 2197(n), courts have held that

the comparable "for the purpose of influencing" element under the false-statement-to-a-financial-

institution statute, 18 U.S.C. § 1014, does not require proof of an intent to defraud.  *See United

States v. Sparks*, 67 F.3d 1145, 1151 (4th Cir. 1995) (holding "that an intent to deceive is simply

irrelevant to the defendant's guilt" under section 1014); *United States v. Blumenthal*, 945 F.2d

280, 282 (9th Cir. 1991) (holding that intent to deceive is not a necessary element of section 1014);

*United States v. Sabatino*, 485 F.2d 540, 544–45 (2d Cir. 1973) ("Proof that an applicant did not

intend to defraud the bank is irrelevant to whether he intended to influence the bank by false statements."); *cf. United States v. Wells*, 519 U.S. 482, 489-90 (1997) (holding that materiality is not an element of the offense under section 1014). Thus, the absence of an element of fraud takes section 2197(n) outside the WSLA.

The same holds true of the money laundering charges under section 1956. By definition, that offense does not require fraud as an essential element. Indeed, the crime can be predicated upon a whole variety of offenses not involving fraud. *See* 18 U.S.C. § 1956(c)(7) (defining "specified unlawful activity"). And the government need not even prove that the defendant knew the precise underlying crime committed. *See id.* § 1956(c)(1) (defining the element "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity" to mean "that the person knew the property involved in the transaction represented proceeds from some form, though not necessarily which form, of activity that constitutes a felony under State, Federal, or foreign law"). Accordingly, the money laundering offenses are beyond the reach of the WSLA.

### d.     How to proceed from here?

Having determined that sub-clause (1) under the WSLA does not save the false statements and money laundering offenses from the five-year time bar, the question becomes how to proceed from here. As discussed, because Defendant challenges these counts for the first time post-trial, he must show "good cause" for the late challenge based on ineffective assistance of counsel. The above discussion establishes that Defendant possibly suffered prejudice from his counsel's failure to move to dismiss the false statements and money laundering charges. But the court cannot yet

conclude Defendant received ineffective assistance, because two open questions remain, one factual and one legal.

The factual question concerns the performance prong of *Strickland*: Why did trial counsel not challenge the false statements and money laundering charges on limitations grounds? The present record does not even attempt to answer this question. There may be no reasonable tactical grounds for counsel's failure to advance that challenge, but the court is not prepared to *presume* as much. As for the legal question, it concerns whether either sub-clause (2) or (3) of the WSLA suspended the limitations period for the offenses in question. The government invoked these two sub-clauses for the first time in its sur-reply brief, meaning Defendant has not had an opportunity to respond. The court is not prepared to rule on the applicability of sub-clauses (2) and (3) to the false statements and money laundering counts without the benefit of briefing from Defendant.

The court therefore will proceed as follows. The parties may supplement the record by May 1, 2019. Both parties may submit evidence bearing on the issue of trial counsel's failure to challenge the timeliness of the false statements and money laundering counts. Additionally, Defendant may respond to the government's argument regarding the applicability of sub-clauses (2) and (3) of the WSLA. The court already has received substantial briefing from the parties, so

any supplemental filing shall be limited to ten pages, excluding exhibits. Based on the new submissions, the court will decide whether a second hearing is necessary.

## IV.  CONCLUSION AND ORDER

For the foregoing reasons, Defendant's Combined Rule 29 and 33 Motion is denied in part and deferred in part. The parties may make supplemental submissions consistent with this Memorandum Opinion by May 1, 2019.

Dated:  April 10, 2019                                          Amit P. Mehta
                                                                United States District Judge